MYERS v. THE CITY OF KANSAS, *Appellant*.

IN BANC.

1. **Municipal Corporation:** DEFECTIVE STREET : NEGLIGENCE. Where, in an action against a city for injuries received by falling into an excavation in its street, it is a fairly debatable question whether the excavation was protected by a barrier as required by ordinance, the question is properly one for the jury.

2. ———: PRACTICE : CONTRIBUTORY NEGLIGENCE : PRESUMPTION. Where there is a defense of contributory negligence, and evidence offered in its support, the court should not instruct the jury that the plaintiff is presumed to have been in the exercise of ordinary care at the time of the accident.

3.  ———— : EXCAVATION IN STREET : INSTRUCTION.   It is error to refuse
to instruct the jury, in such suit against the city, that if barriers
and lights were up during the night and before the plaintiff fell, the
city performed its duty and was not liable, although the barriers
and lights were thrown down when the plaintiff fell, if the same
were down without the fault or negligence of the city, or of the
person it permitted to make the excavation.

4.  ———— : ORDINANCES : EVIDENCE.   Ordinances of the city relating
to excavations in its streets and barriers, therefore, were properly
admissible in evidence.

*Appeal from Buchanan Circuit Court.*—Hon. O. M.
SPENCER, Judge.

REVERSED AND REMANDED.

*R. L. Yeager* and *W. S. Cowherd* for appellant.

(1) The trial court found the verdict was grossly
excessive.   This was equivalent to a finding that it
was rendered under the influence of passion or preju-
dice; and, if this were true, it was the duty of the court
to set the verdict aside and submit the case to a fair
and impartial jury.   *Koetz v. Bleckman,* 46 Mo. 320;
*Doty v. Steinberg,* 25 Mo. App. 335; *Sheedy v. Brick
Works,* 25 Mo. App. 531; *Cassin v. Delaney,* 38 N. Y.
178; *Thomas v. Womack,* 13 Tex. 580; *Heidenheimer
v. Schlett,* 63 Tex. 395; *Steinbuchel v. Wright,* 43 Kan.
304; *Railroad v. Dwelle,* 24 Pac. Rep. 500; *Nudd v.
Wells,* 11 Wis. 407; *Adams v. Railroad,* 100 Mo. 555;
Sutherland on Damages, pp. 813–14.   (2) Instruction,
numbered 2, on behalf of the plaintiff told the jury
that the plaintiff was presumed to have been in the
exercise of ordinary care.   In view of the evidence
tending to show the plaintiff was intoxicated and
guilty of contributory negligence, this was error.
Ordinary care is presumed only when there is no evi-
dence to the contrary.   *Moberly v. Railroad,* 98 Mo.
183; *Nichols v. Winfrey,* 79 Mo. 551; *Ham v. Barrett,*
28 Mo. 388.   (3) Instruction, numbered 4, for the

plaintiff tells the jury to take into consideration the age of the plaintiff in estimating his damages. There was no proof of age. *Hinds v. Marshall,* 22 Mo. App. 208; *Gessly v. Railroad,* 26 Mo. App. 161; *Carpenter v. Railroad,* 38 Hun, 116. An instruction should not authorize the jury to consider matters concerning which there is no evidence. Moreover, the plaintiff claimed that his injuries were permanent, and this instruction authorized a recovery for such injuries. There being no proof of age, nor of the plaintiff's expectancy of life, there was no proper foundation for estimating the damages that would follow permanent injuries. *Chase v. Railroad,* 39 N. W. Rep. 197; *Worden v. Railroad,* 41 N. W. Rep. 26; *Whelan v. Railroad,* 38 Fed. Rep. 15. (4) Even though the city provides a way in which excavations shall be guarded, it does not follow that any other form is negligence. As between the city and the traveler, the city's whole duty is fulfilled if it erects and maintains barriers or lights sufficient to warn one in the exercise of ordinary care of his danger. *Stephens v. Macon,* 83 Mo. 345; *White v. Boston,* 122 Mass. 491; *Cornelius v. Appleton,* 22 Wis. 637; *Vanderpool v. Husson,* 38 Barb. 196; *Koesler v. Ottumwa,* 34 Iowa, 41. (5) Instructions, numbered 6 and 7, asked by defendant, should have been given. Had the excavation in question been made by the city itself, and properly guarded, and thereafter these guards removed without its knowledge or consent, there would be no liability on the part of the city until notice of such removal, actual or constructive, was shown. *Ball v. Independence,* 41 Mo. App. 469; *Maus v. Springfield,* 101 Mo. 617; *Bonine v. Richmond,* 75 Mo. 437; *Carrington v. St. Louis,* 89 Mo. 212; *Klatt v. Milwaukee,* 53 Wis. 196. (6) The motion for new trial should have been sustained on the ground of newly discovered evidence. This evidence was important, relevant and material, and would probably have produced a different result. It was owing to no fault of the defendant it was not

produced at the trial. *State v. Curtis*, 77 Mo. 267; *State v. Murray*, 91 Mo. 95; *Helm v. Bassett*, 9 Mo. 54; *Howland v. Reeves*, 25 Mo. App. 467.

*Sherry & Hughes* for respondent.

(1) The law presumes the plaintiff was in the exercise of ordinary care; and, under the pleadings, it was for defendant to overcome this presumption by evidence or facts from which the jury might infer want of ordinary care. *Buesching v. Gaslight Co.*, 73 Mo. 233; *Hoyt v. Hudson*, 45 Wis. 105, 111; *Guy v. Winter*, 34 Cal. 153; *Flynn v. Railroad*, 78 Mo. 195; Black on Proof & Pleading in Accident Cases, page 9; *Thomas v. Railroad*, 8 Fed. Rep. 731; 2 Thompson on Neg., secs. 27, 1179; *Stephens v. Macon*, 83 Mo. 356, 357. (2) The instructions, taken together, present the law of the case fairly. *Flora v. St. Louis*, 3 Mo. App. 231; *Hamby v. Brasher*, 51 Mo. 439; *Porter v. Harrison*, 52 Mo. 524; *State v. Holmes*, 54 Mo. 153; *Myers v. Railroad*, 59 Mo. 223; *Moore v. Sanborn*, 42 Mo. 490; *McKeon v. Railroad*, 43 Mo. 405; *Marshall v. Ins. Co.*, 43 Mo. 586; *Noble v. Blount*, 77 Mo. 235; *Carlisle v. Co.*, 82 Mo. 40. (3) The plaintiff was before the jury, and they could know his age to a reasonable certainty without any proof on the subject. The man himself is sufficient proof of his age. *State v. Anderson*, 19 Mo. 241. It is well settled that persons and things may be produced in court for the inspection of the jury, and that such articles and persons so produced form part of the evidence submitted. 12 Am. & Eng. Ency. of Law, title, Jury and Jury Trial, subdivision "Trial of Issue," page 367, and many authorities there cited; 1 Thompson on Trials, secs. 850, 851, 856, 857. (4) The error complained of by appellant in its fourth point, if it is an error, was invited by instructions, numbered 3, 6 and 7, asked by appellant, and it cannot here claim it was error. *Newton v. Miller*, 49 Mo. 298; *Bank v.*

*Armstrong,* 62 Mo. 59 ; *Davis v. Brown,* 67 Mo. 313 ; *Garesche v. College,* 76 Mo. 332 ; *Noble v. Blount,* 77 Mo. 233 ; *Crutchfield v. Railroad,* 64 Mo. 255 ; *State v. Beatty,* 25 Mo. App. 214. (5) It was the duty of defendant to use whatever precautions were proper and necessary to keep the street in a condition of reasonable safety for legitimate travel by night as well as by day. *Haniford v. City of Kansas,* 103 Mo. 172 ; *Maus v. Springfield,* 101 Mo. ; *Stephens v. Macon,* 83 Mo. 345 ; *Russell v. Columbia,* 74 Mo. 480 ; *Loewer v. Sedalia,* 77 Mo. 431. (6) The damages are not excessive. *Railroad v. Stout,* 17 Wall. 663 ; *Wilson v. Dock Co.,* L. R. 1 Eq. 190 ; Patterson's Railway Accident Law, pp. 469, 470 ; *Wells v. Sanger,* 21 Mo. 364 ; *Goetz v. Ambs,* 27 Mo. 35 ; *Lanius v. Publishing Co.,* 20 Mo. App. 12 ; *Merrill v. St. Louis,* 12 Mo. App. 466 ; *Barbour v. McKee,* 7 Mo. App. 587 ; *Myer v. Tamur,* 11 Mo. App. 599 ; *Welch v. McAllister,* 15 Mo. App. 492.

THOMAS, J.—This is an action by plaintiff to recover damages for injuries received by him in consequence of falling into an excavation permitted by the city to be dug at the intersection of Grand avenue and Fifteenth street, by the Grand Avenue Railway Company. This excavation was some fifty feet long, extended the width of the sidewalk, about fifteen feet, and was eight or nine feet deep. It was in front of an engine-house on the west side of Grand avenue, which there runs north and south, and the railway company had placed in it its sheaves and other machinery with which to run its cables.

A general ordinance of the city, then in force, provided that every person, who, under permission of the superintendent of buildings, makes excavations under or adjoining streets, shall cause the same to be inclosed with good, substantial and sufficient barriers, not less than three feet high and shall also place a red light at each end thereof, in such position as to shed its light

upon such excavation and shall keep such lights burning from sunset until sunrise.

By an ordinance approved February 1, 1886, the defendant city granted to the Grand Avenue Cable Railway Company the right to construct its line, and to make the said excavation. This ordinance required said company to comply with the ordinances of the city in reference to street excavations, and to hold defendant harmless from damages caused by the negligence of said company in the construction of its road.

The evidence on the part of the plaintiff tended to prove that plaintiff lived, at the time of his injury, on a farm twenty-three miles from Kansas City; he had formerly lived in that city and was familiar with the streets at and near the intersection of Grand avenue and Fifteenth street; he went to the city about the twenty-first day of July, 1887, to transact some business; while there he traded for a cow which he did not desire to drive home during the day on account of the heat and he intended to wait till the moon rose, which was late in the night before starting; during the evening he was engaged in buying some picks and shovels; about ten o'clock he crossed Grand avenue from the east to the west side for the purpose of going to a store to buy a drill; it had been raining and was very dark at that time; he did not know the said excavation had been made; it was not lighted and as he crossed the street he walked into it without meeting any obstruction whatever, and without seeing it, until he fell; he was precipitated upon some machinery in the excavation, and the femur of his left leg was fractured. He hallooed for help, but he thinks it was two hours before anyone came to his relief. He was finally rescued, and taken to the city hospital.

The evidence on the part of the defendant tended to prove that the excavation was properly guarded by barriers and lighted as required by its ordinance the night plaintiff was injured; that plaintiff had been

drinking and that he could not have fallen into the excavation without crawling under or climbing over the barriers.

The jury returned a verdict finding the issues for the plaintiff and assessing his damages at the sum of $10,000. The circuit court required plaintiff to remit $5,000 of this verdict which he did, and judgment was entered for him for $5,000, and this case is here on defendant's appeal, having reached the court *in banc* upon a disagreement of the judges of division number 1.

I. The first contention is that the court erred in refusing to nonsuit plaintiff upon the pleadings and evidence. We do not think this point well taken. The argument is that while it may be conceded that there was enough evidence of the lack of barriers and lights at the moment plaintiff fell into the excavation, to take the case to the jury, yet the evidence was overwhelming and conclusive that the barrier was up and the lights there during the same night before the accident occurred, and that the court ought to have declared as a matter of law that the city was not guilty of negligence in failing to replace a barrier that had been thrown down, it having no knowledge that it was down, and not having the requisite time by the exercise of ordinary care to discover that it was down. This contention, supported by this argument, is based on the whole evidence, that introduced by defendant as well as that introduced by plaintiff, but defendant did not renew its request to nonsuit plaintiff at the close of its case.

There is but little doubt that plaintiff's evidence made a *prima facie* case of negligence on the part of defendant, in leaving the excavation unguarded, but it is claimed that the evidence on the part of defendant proved conclusively that the barrier was up that night prior to plaintiff's injury, and, hence, if it was down at the time plaintiff fell, defendant could not be held guilty of negligence in not discovering it was down, and

in not replacing it, and that the court ought to have told the jury this fact was proved, and, being proved, the plaintiff could not recover.

The court, however, even if requested, should never instruct the jury that a disputed fact was proved, unless the evidence is so conclusive and convincing that all fairminded men would decide it the same way.

A careful perusal of the evidence in this case convinces us that it is a fairly debatable question whether the particular barrier at the point of the accident was up that night at all, prior to the time plaintiff fell, and it was, therefore, properly left to the jury to determine.

II. The defendant's answer contained a plea of contributory negligence on plaintiff's part, there was evidence to support that plea, and, hence, the court should not have instructed the jury, as it did, that the plaintiff was presumed to have been in the exercise of ordinary care at the time of his injury. That presumption obtains only in the absence of evidence to the contrary. *Moberly v. Railroad*, 98 Mo. 183; *Rapp v. Railroad*, 106 Mo. 423.

III. The defendant asked the court to instruct, but the court refused to instruct, the jury that if the barriers and lights were up in the night before plaintiff fell defendant performed its duty and was not liable, although the barriers and lights were down at the time plaintiff fell, if the same were down without the fault or negligence of the defendant or the Grand Avenue Railway Company. This instruction ought to have been given. If the barriers were up at the beginning of the night, we are clearly of the opinion that defendant should not be held liable, in the absence of evidence that it knew they had been thrown down afterwards, or that they had afterwards been down so long that it ought to have discovered that fact by the exercise of ordinary care in time to have avoided the injury.

IV. The ordinances of defendant above mentioned were properly admitted in evidence, whether objected

to or not.   The general ordinance requiring excavations in the streets, made under permit of the superintendent of buildings, was expressly made applicable to excavations for the street railway in question by the terms of the special ordinance authorizing its construction.

For the errors pointed out the judgment is reversed and the cause remanded for new trial.   BLACK, BARCLAY, GANTT and MACFARLANE, JJ., concur.   SHERWOOD, C. J., and BRACE, J., hold that the judgment ought to be reversed simply without remanding.

SHERWOOD, C. J.   (*dissenting*). — The following statement and opinion were filed in division number 1 of this court, before this cause was transferred to court *in banc*.   I here file them as my conclusions of fact and of law, and, consequently, dissent from the opinion of the majority of this court.   BRACE, J., concurs in this dissent.

### STATEMENT.

Action by plaintiff to recover damages for injuries received by him in consequence of falling into an excavation permitted by the city to be dug at the intersection of Grand avenue and Fifteenth street, by the Grand Avenue Railway Company ; as to which company it seems the action was dismissed.

This excavation was some fifty feet long, extended the width of the sidewalk some fifteen feet, and was some nine or ten feet deep.   It had been dug some time ; was on the west side of Grand avenue which there runs north and south and occupied the sidewalk in front of the engine-house, and the railway company had placed its sheaves and other machinery to run its cables with, in the excavation.   It was partially covered by a temporary board sidewalk about three feet wide, with good substantial railings on either side.   The remainder of the opening was, as claimed by the defendant and shown by the witnesses, securely barricaded with large, heavy

timbers laid on cement barrels set near the curb-line of the street, and at either end short timbers were nailed from the railing on the temporary sidewalk to the cement barrels ; and some three lanterns were hung on the barricades to warn travelers of the danger, and that these lanterns and barricades were in proper position the night of the accident, and but a short time before its occurrence.

Plaintiff was found about one o'clock at night in the excavation. The upper portion of the femur of the left leg was fractured. He was for eight or nine weeks at the city hospital, and confined to his bed for about three weeks longer at his house. At the time of the injury he was living at West Line, in Cass county, Missouri, but had formerly lived within a few feet of the place where he was injured. At the time of the trial he testified he was farming, supporting his family and doing his usual work. The left leg was an inch and one-eighth shorter than the right, and had shrunk somewhat, which injuries the physicians said would be permanent, and that he was not incapacitated from performing many kinds of labor.

There was some enlargement of the thigh bone, which would probably be absorbed, but might be permanent. The jury found for plaintiff, and assessed his damages at $10,000. Upon motion for a new trial, defendant complained that the verdict was so grossly and glaringly excessive, as to indicate prejudice and partiality on the part of the jury. The court found the verdict was grossly excessive, as complained by defendant, and announced that he would sustain the motion unless plaintiff would remit at least $5,000 of the damages so assessed. Plaintiff thereupon entered the *remittitur*, and the court overruled the motion.

The answer of the defendant city was a general denial, and also a plea of plaintiff's contributory negligence.

The plaintiff, according to his story, about eight o'clock at night, started down town and went to a place between Fifteenth and Sixteenth streets on Grand avenue and bought some picks and shovels, which he took to his spring wagon on Twentieth street, and then as it was raining put on his "rain coat," and came back up town to get a drill, but on his way, about nine o'clock, stopped at a saloon first on the northwest corner of Fifteenth street and Grand avenue, where he got a glass of beer, and, notwithstanding that it was raining, he dispensed with his "rain coat;" left it hanging in the saloon, first having supplied its pockets with two pints of whiskey, then he went across to a restaurant on the east side of Grand avenue four or five doors south of Fifteenth street where he ate supper, and then, although it was about *ten o'clock*, he started across the street " in a kind of a southwest direction to go to some second-hand store to find *a drill*," and though he " was walking as smooth as he could," "all at once he went down right in among those wheels and big castings." He says : " I suppose I was down there about two hours. I hallooed several times, but I couldn't make anybody hear ; finally one police heard me and came' with a lantern," etc.

He says further :  " The place I was going to get the drill was David's place, right next to the cable house ; I didn't find any barricades at all in front of this excavation that I fell in.   I didn't meet with any obstruction before I fell into the hole.   It was a very dark night ; had been raining just a minute before.   There was no red lights there.   I was not intoxicated   *   *   * I didn't strike a single thing there when going into this hole ; I didn't knock down anything ; I had *not* drunk *no* whiskey *that* day.   There was a barricade at that part of the excavation in front of Joe and Charlie's saloon, and  one  light there ; that  was  all  I  saw.   Joe and Charlie's saloon is on the northwest corner of Fifteenth and Grand avenue."

Eymann, a saloon keeper, says: "I noticed one ray of light on the east end of the hole near Fifteenth street. * * * When I found Myers, he was lying between the sidewalk and the building; that is, between the stone wall built at the curb and the building proper. * * * There was no electric lights at that corner at that time. There were guardrails along the sidewalk, along the building; didn't examine carefully to see whether there were any guardrails or railing on the east side of the excavation; I didn't take notice; it was too dark a night to see."

Goode testified for plaintiff: "On the twenty-first of July, on or about that time, I was in Joe and Frank's saloon, Fifteenth and Grand avenue. I heard a police whistle and went out across to the opposite corner to the cable-house. I heard a man shouting, and, looking down, saw him amongst the machinery. To the best of my knowledge, this was about midnight. This was a hole in front of the engine-house, with a rock wall in front, used for the cable machinery. I didn't see any danger signals at the corner, and I walked straight from the saloon there, without any fence preventing me. The night was light enough for me to see a man down there, but I couldn't tell his features, or anything about him. I did not help to take him out nor wait until he was taken out. I can't say how far a man could have stood away and seen that hole. I could see the rock wall; when I got to it I stood on it."

Marden, another witness on the part of the plaintiff, testified: "It was very dark and stormy, and no lights that I could see in the block. I had noticed this hole some number of days before; it was a large hole in the sidewalk in front of the engine-house. At that time I didn't see anything to prevent anybody from falling in. On the night I speak of, I noticed the hole in front of the cable-house; saw no lights there; I didn't notice any barrier around the edge of the hole to

prevent passers by from falling in. I didn't look to see whether there was any or not; I paid no particular attention to it. I didn't see any lantern or danger signal."

This is the substance of the plaintiff's evidence. That on behalf of the defendant city will now be given : White, a night-watchman at said engine-house, testified : " During the month of July, 1887, I was stationed at the engine-house, southeast corner of Fifteenth and Grand avenue. I was there when the plaintiff was hurt by falling into the hole in front of the engine-house. I was inside of the engine-house when my attention was attracted by the blowing of a police whistle. The policeman's name was Heydon. This was one o'clock in the morning. I went out on the sidewalk and down into the hole where the man was. He was standing in between two wheels, and was resting with his hands on the shaft of the wheels. These were large wheels placed horizontally. I tried to lift him out while Officer Heydon held one of the signal lanterns down in the hole. He stood on the sidewalk. With the assistance of two gentlemen, we got him out from the wheels, carried him out through the engine-house to Walnut street, put him in the patrol wagon, and he was taken away. I was the only night-watchman at the engine-house. At this time the street in front of the engine-house was all right; that is, there were no excavations in the street except the sidewalk part. The sidewalk was all open except a temporary bridge; this bridge was about three feet in width and a barricade on each side of it about three feet high. The opening extended the full width of the sidewalk and the length of the engine-house. It was about nine feet deep where Myers fell in. At the time he fell in it was barricaded all around ; on the eastern or outer side of the excavation there was a barricade made by posts, cement barrels and heavy timbers placed about two feet and a half from the ground. The ends were barricaded the same

way.  There was no portion of the opening in the side-walk that was not barricaded.  On this night signal lights had been placed about the opening.  I was out in front of the engine-house about fifteen minutes before I heard the police whistle.  The barricades were then in proper position, and there were three signal lights around the opening ; one at each end of the barricade and one in the center.  I put up a ladder for the gentleman to come down who helped take Myers out. Myers was about three feet from the stone wall when I found him, and about six feet from the north end of the opening.  He had been drinking ; I don't know whether he was drunk or not, but a strong smell of whiskey came from his mouth.  It was my duty as night-watchman to look after everything about the place, see that the signal lights were out, and that the barricades were up in proper shape.  I was in the second story of the engine-house when the man fell in, looking to see if everything was right.  This sidewalk or bridge over the excavation was made of three beams laid lengthwise, and boards nailed over them crossways.  The barricades on this were made by nailing uprights to the beams and then nailing three boards along the side of them.  I don't know how Myers got over the barricades ; there was not room enough for him to get under them unless he crawled under them.  I am not positive about three lights burning at the place I have spoken of.  I am certain this was one o'clock Thursday morning. The street is about eighty feet wide beside the side-walk."

Heydon, sergeant of police, referred to by White, testified : "In July, 1887, I was roundsman number 4 of the Kansas City police force, on night duty.  About one o'clock that night I started to leave Officer Cassidy at Fifteenth and Walnut streets ; I was to meet him at one o'clock.  As I passed in front of the engine-house I heard some one groan.  I took a lantern from one of the barricades, and tried to look down an opening in

the sidewalk in front of the engine-house. I went down to Fifteenth and Walnut, but couldn't find Cassidy, and while returning to Fifteenth and Grand avenue I blew my whistle. I telephoned for the patrol wagon from Armory Hall. I went back to where the accident happened, and by that time the watchman and two or three other parties were there; the watchman went down in the hole first; the ladder was leaning against the wall, and I steadied it for him. The watchman and two other parties carried the man out in the rear of the engine-house on Walnut street, and Officer Frayser was there at the patrol wagon. There were no excavations in the street at this time; it had been newly paved to the curb line; there was an a ea-way in the sidewalk in front of the engine building, about twelve or fifteen feet deep, and extended the full width of the sidewalk. There was a bridge for people to travel over this area-way, wide enough for two men to walk abreast, with railings on both sides of it, and barricades around the whole of the area. There was one piece of timber on the outer edge that had been knocked down at one end; this was nearly over the place where the plaintiff was lying. Myers was about three feet from the base of the retaining wall, at the curb line. There was a solid stone retaining wall at the curb line on the east side of the area. My memory is that the barricade was made of four-by-four's laid on top of empty barrels. I think there were four barrels; those the lights were on were about fifteen feet apart; the boards on the barrels were about fifteen feet long; it was the north end of the one nearest the corner that was knocked down; the ends of the excavation were barricaded with two short timbers each—one end, I think, nailed on the bridge and the other to the barrel. There were saloons on the northeast corner, the southeast corner and the northwest corner."

Frayser, the policeman mentioned by Sergeant Heydon, testified: "I reside in Kansas City, Missouri;

am a member of the police force, and was on the
twenty-first of July, 1887. I was at that time on night
duty; Fifteenth and Grand avenue was within my beat.
Sergeant Joseph Heydon's beat also covered that point.
I was at Twelfth and Grand avenue about one o'clock
on the night of the twenty-first of July. Sergeant blew
his whistle at Fifteenth and Grand avenue. I started
down there, but the patrol wagon overtook me, and I
got in and rode to the rear of the engine-house on Wal-
nut street. When we got there two men were carrying
out the man that was hurt. I think they were the
night-watchman and a saloonkeeper; Officer Cassidy also
was possibly with them; they put the man in the
wagon, and I went to the station with them. About
three-quarters of an hour afterwards I returned to the
corner of Fifteenth and Grand avenue; I noticed the con-
dition of the street at that time, in front of the engine-
house; the sidewalk was all open except a temporary
sidewalk three feet wide, along in front of the house.
There was a handrail on this about three feet high;
there were barricades and railings all around the open-
ing so that no portion of it was unprotected by barri-
cades. These barricades were made of barrels set on
end and pieces of timber on top of the barrels, and there
were two lights on the barrels. These lights were about
six or eight feet apart on the outer edge next to the
street, and where plaintiff went down was right in
between the lights. I thought Myers had been drink-
ing; I could smell the liquor on him, and his actions
indicated it. I did not know Myers before this acci-
dent. I caught hold of his arm and helped to put him
on the stretcher; I rode in the wagon with him to the
station; he acted kind of stupid; didn't do anything
but lay there. It was part of my duty as night-watchman
in the employ of the city to see that all excavations in
the street on my beat were properly lighted and
guarded. I had passed the cable engine-house on
Grand avenue a few minutes before the plaintiff fell in,

and the barricades and lights were up around the opening, the same as they were when I noticed them after Myers fell in."

Cassidy, another member of the police force, testified: "Was called to Fifteenth and Grand avenue about one o'clock at night on the twenty-first of July, on account of a man falling into an opening in the sidewalk in front of the engine-house. I went down into the area-way and assisted in carrying him out. After he was taken out and carried away, I made an examination of the opening in which he fell. I found there were barricades and danger signals around it, and that there was no part of it that was not barricaded. When I went down into the excavation to help him out, I took down one end of the barricade on the outer edge of the excavation, just where I first saw him. According to his breath, he had been drinking considerable before he fell. I was between the alley and Walnut street, on Fifteenth street, when I heard Officer Heydon's whistle. I went up to him at Fifteenth and Grand avenue. I couldn't say how many lights there were at that time; though there were lights there; there were lanterns put there for danger signals; I couldn't say how many or what color they were."

Thomas, superintendent of construction of the Grand Avenue Cable Railway Company, and in the employ of that company, and not one of the contractors, testified: "I was at Fifteenth and Grand Avenue three or four times a day, sometimes a dozen times a day. I remember of Myers getting hurt. The street proper at that time was all right, the paving had been relaid. There was an area-way about twelve feet deep in the sidewalk, extending the width of the sidewalk east and west and the width of the building north and south. The temporary sidewalk extended over this about four feet wide, with railings on both sides. There was no portion of this area-way open that was not barricaded up. This drawing I now look at

correctly shows the location of the engine-house, the area-way and the sidewalk, the temporary sidewalk, the barricades and the retaining wall. The barricades had been up on the east side of this excavation, at the time of the accident, about a week or two, I think."

Southward, the assistant superintendent, but material clerk of that company at the time of the accident, who had occasion during the month of July to be at the engine-house every day and occasionally at night, and had been at the engine-house several times the day preceding the night when the plaintiff fell, gave similar testimony as to the excavation being well barricaded.

Frey, auditor of the company and paymaster during the month of the accident, had occasion to be at the engine-house frequently, and was accustomed to stop there on his way home to see how the work was progressing, testified in a similar way regarding the substantial character of the barricades, and on the day before the night when the accident happened, and he further testified: "I was at the engine-house that day, not later than seven o'clock; at that time there was no portion of this area-way that was unbarricaded.

At the conclusion of the plaintiff's evidence, the defendant city asked an instruction in the nature of a demurrer to the evidence, which was refused.

### OPINION.

It will be observed that plaintiff does not deny that there were lights at the locality where he fell; he only denies that there were "*red* lights" there.

He denies that there were any obstructions in his way, when he fell; but his witness Eymann admits that there was one light at the locality, and that he didn't examine carefully to see whether there were any guardrails on the east side of the excavation. Goode is the only witness who supports the plaintiff by affirmative testimony as to lack of barricades; but, though he

says he didn't see any danger signals at the corner, yet he says that it was light enough for him to see a man was down in the excavation, and light enough for him to see the retaining wall, and that he stood on it when he got there.

The testimony of Marden is altogether of a negative character, saw no lights there, didn't notice any barrier, paid no particular attention to it.

But, on the part of the defendant city, there are at least seven witnesses who give affirmative and positive testimony as to the existence of suitable barricades on the night of the accident, and there are five of those witnesses who give equally positive and affirmative testimony as to the existence of lights at that time; and most of these were men whose official or *quasi* official duties required of them to notice if the excavation in question was properly lighted and barricaded.

That the excavation was lighted is virtually conceded by the plaintiff, and that there was light enough to see the retaining wall over which the plaintiff fell, and to see the plaintiff after he fell, is directly admitted by Goode. There is, therefore, nothing but negative testimony as to there being no light; and the testimony of but two witnesses as to there being no barricades; one of whom, according to much of the testimony and according to his own admissions, was not in a very appreciative condition, either as to whether it was raining or as to whether there were obstructions in his way. In such circumstances, the testimony in favor of the locality having been properly lighted and protected must be regarded as simply overwhelming; and this upon the principles of affirmative testimony being more valuable than negative, and upon the further principle of testimony being more valuable where the attention of the affirmative witness has been particularly called to the subject by the nature of his duties official and otherwise. Starkie Ev. [9 Ed.]

867-8 ; Whart. Crim. Ev. [ 9 Ed.] sec. 382 ; 1 Thompson, Neg. 431 ; Best's Prin. Ev. ( Chamberlayne ) 280.

The fact that the jury in the face of so much affirmative, positive and explicit testimony, testimony of witnesses whose attention was especially called by their duties to the condition of the lights and barricades, found a verdict for the plaintiff in the sum of $10,000, goes but to commend the action of the circuit court in condemning the damages awarded by that verdict as grossly excessive, and as impliedly the result of passion and prejudice.

II. But, in our opinion, the circuit court should have rejected the verdict altogether, and, for these reasons: Nothing short of negligence could charge the defendant city ; the extent of its care in the performance of its duties was *ordinary care.* It was not the general warrantor of the safe condition of its streets. It is necessary to show negligence on the part of the city's officers, and to show it *affirmatively* before any liability will be created. The existence of a defect or obstruction in the street which causes the injury is insufficient. The use of ordinary care by the city to have prevented or cured the defect will prevent liability from attaching so that it is necessary to go a step further and show the corporation to be in some way responsible for the defect either by reason of having directly caused it or assented to its creation by another, or with actual or implied notice of its existence, permitted it to remain. 1 Shearman & Redfield, Neg. [ 4 Ed.] sec. 290, and cases cited.

None of these conditions of liability exist in the facts aforesaid disclosed by this record. If we take it that the excavation was securely lighted and guarded as the great preponderance of the evidence tends so clearly and convincingly to show, then manifestly the city, having been guilty of no negligence, has incurred no liability.

If, on the other hand, we take it that the excavation was unlighted and unguarded, then this testimony, if believed in its fullest extent, is wholly insufficient inasmuch as it does not appear when the negligent situation began. Taking either horn of the dilemma, the judgment should be reversed.