## MARY C. BURGE v. WABASH RAILROAD COMPANY, Appellant.

### In Banc, June 10, 1912.

1. **LAWS: Amendment: Reference to Section Amended.** A statute may be amended by reference to the section of the Revised Statutes to be amended, by a statute declaring what words are to be stricken out and what words are to be inserted in lieu of those stricken out, and by setting out the whole section as thus amended.

2. ————: ————: **Title: Heading of Chapter.** The title prefixed to a chapter of the Revised Statutes may be made a part of the amendatory act by suitable words of reference contained in the heading, caption or title of the amendatory act; and a title of the amendatory act identical with that of the chapter in the Revised Statutes complies with the Constitution, if the matters in the body of the act are germane to the provisions of the section of the Revised Statutes of which they are to become a part.

3. ————: ————: ————: **Meaning of One Subject.** The provision of the Constitution that "no bill shall contain more than one subject, which shall be clearly expressed in its title," is to be wisely and liberally interpreted, is not to be so applied as to thwart the efficiency of intelligent and salutory legislation, and does not forbid the inclusion in one bill under one general title of subjects naturally and reasonably related to each other.

4. ————: ————: ————: ————: **Damage Act: Amendment of 1905.** The title to the act is: "An Act to amend section 2864 of chapter 17 of the Revised Statutes of the State of Missouri, 1899, entitled, 'Damages and Contributions in Actions of Torts.' Section 1. Death resulting from negligence of co-employee, officer or agent—amount of damages—who may sue for recovery." The body of the act consists of one section. *Held*, provisions in the body of the act (1) abolishing the defense of fellow-servants, (2) adding the automobile to the other dangerous agencies for the negligent operation of which a recovery for personal injuries may be had, (3) adding street and electric railways to the category of other carriers, (4) inserting the word "penalty," and providing that in case of personal injury resulting in death the penal sum to be recovered should be between $2000 and $10,000 instead of $5000 as theretofore, and (5) providing that the administrator might sue in

Burge v. Railroad.

certain contingencies, were all germane both to the title and to the provisions of Sec. 2864, R. S. 1899, which the act undertook to amend.

5. NEGLIGENCE: Crossing: Looking and Listening. A railroad crossing is of itself a signal of danger. The law imposes upon a traveler the duty of exercising caution at such a place. He must make some effort to find out if there is an approaching train before he drives upon the track. He can close neither his eyes nor his ears. If he fails to exercise that caution he is guilty of such negligence as bars a recovery, unless the facts bring the case within the humanitarian rule.

6. ————: ————: What Others Saw and Heard: Presumption. The presumption that a traveler about to cross a railroad track at a public road crossing was in the exercise of due care can be indulged only when there is no evidence upon the point. Where other witnesses not so well situated heard the roar of the approaching train and it could have been seen by the traveler for 900 feet from a place of safety before entering upon the track, and he drove ahead with his eyes fixed forward on his horse, and neither looked nor listened, until the alarm whistle was sounded 340 feet from the crossing, there is no room for the presumption of due care; for what others saw he could have seen, and what others heard he could have heard.

7. ————: ————: Neither Looking nor Listening: Humanitarian Rule. Where the traveler was guilty of contributory negligence in attempting to cross the railroad track without either looking or listening, when to have done either meant safety, there can be no recovery for his death under the humanitarian rule where there is no substantial evidence that the train could have been stopped between the time his peril was discovered and his injury. In this case, the train was running from sixty to ninety miles an hour, and the engineer could not have seen the traveler about to cross the track until it rounded a curve 1000 feet away, the alarm whistles were sounded and the air-brakes put on before he was hit, and the train ran 1700 feet after he was hit; and there is no substantial evidence that it could have been sooner stopped.

Held, by KENNISH, J., dissenting, that, there being evidence that the traveler was seen attempting to cross the track while the train was four or five hundred feet away and that the train could have been stopped within that distance by the exercise of ordinary care, the judgment for plaintiff should not be reversed outright, but reversed and the cause remanded.

8. ————: ————: ————: ————: Stopping Train: Question: Material Elements. In stopping a train due regard must be had for the safety of the passengers, the make-up and equip-

ment of the train, and the grade and condition of the track (whether dry or wet, etc.); and a question asking an expert witness in what distance a train running sixty miles an hour might have been stopped, which omits those material elements, should not be allowed; nor is an answer thereto of "about four hundred feet" of any probative force.

9. ———: ———: ———: ———: ———: **In Eleven Seconds.** To hold the engineer of a train going sixty miles an hour guilty of negligence under the humanitarian rule for failure to discover a traveler's peril, sound the alarms and apply the brakes, all in eleven and four-elevenths seconds, is to require him to act with the rapidity of electricity, and is to stretch the rule of ordinary care beyond reasonable limits.

10. ———: **Speed of Train: In Country.** The rate of speed of a train at an ordinary and usual country crossing has no bearing upon the question of negligence, except as an element in determining within what distance the train may be stopped. Outside of cities and towns the law does not prescribe the rate of speed of railroad trains at public crossings; and the running of a train at a very high rate of speed at such a crossing is not negligence.

Appeal from Randolph Circuit Court.—*Hon. A. P. Terrill*, Judge.

REVERSED.

*J. L. Minnis* and *Robertson & Robertson* for appellant.

(1) The defendant's demurrer at the close of the evidence for the plaintiff and its demurrer at the close of all the evidence, should have been granted. At the close of the evidence for the plaintiff, the evidence showed that a view of the train nine hundred feet away could be obtained at any time while a person was going up the incline to the tracks or while upon the tracks. Furthermore the evidence showed that the train was heard by a person further away from the track than the deceased, at the time deceased was thirty-five feet from the crossing and further, that the train was visible to a person at a point nearly one

hundred feet further north and away from the cross-
ing than the plaintiff's husband, at the time he was
about to go upon the crossing. No witness for the
plaintiff states that the decedent did stop, look or
listen, but some say he did none of these things. But
whatever of presumption of due care, if any, can arise,
it. is certainly rebutted by the physical facts and the
testimony of witnesses, who in less advantageous po-
sitions than the deceased, both heard and saw the
train before the plaintiff got upon the track, and it
must be concluded that if he looked he saw, and if he
listened he heard, so that his going upon the track at
this time, whatever he may have done or may have
omitted to do in looking out for his own safety, was
negligence and the plaintiff cannot recover.   McGee
v. Railroad, 214 Mo. 535; Stotler v. Railroad, 204 Mo.
619; Holland v. Railroad, 210 Mo. 338; Green v. Rail-
road, 192 Mo. 131; Schmidt v. Railroad, 191 Mo. 215;
Boyd v. Railroad, 105 Mo. 391; Walker v. Railroad,
193 Mo. 453; Hutchison v. Railroad, 195 Mo. 546;
Mockowick v. Railroad, 196 Mo. 550; Spillane v. Rail-
road, 135 Mo. 424.   The evidence showed that the train
was in plain view of plaintiff's husband before he
went upon the track, and therefore the rate of speed
was immaterial.   Stotler v. Railroad, 204 Mo. 619;
Schmidt v. Railroad, 191 Mo. 215; Green v. Railroad,
192 Mo. 131.   There was no evidence to take the case
to the jury upon the humanitarian doctrine.   Nivert
v. Railroad, 232 Mo. 626; Sites v. Knott, 197 Mo. 712;
Krehmeyer v. Railroad, 220 Mo. 639; Guyer v. Rail-
road, 174 Mo. 344; Van Bach v. Railroad, 171 Mo. 338;
Davies v. Railroad, 159 Mo. 1.   The rate of speed of
the train could not be considered as having any bear-
ing upon the case as it could not be considered as
negligence.   McGee v. Railroad, 214 Mo. 535; Salter
v. Railroad, 88 N. Y. 42; Railroad v. Lee, 68 Ill. 556;
Railroad v. Walker, 113 Ind. 196; Railroad v. Cromer,
106 Ga. 296; Railroad v. Clark, 73 Ind. 168; Parker-

son v. Railroad, 80 S. W. 468; Powell v. Railroad, 76 Mo. 80; Maher v. Railroad, 64 Mo. 275; Boyd v. Railroad, 105 Mo. 371; Goodwin v. Railroad, 75 Mo. 73; Lord v. Railroad, 82 Mo. 139; Kreis v. Railroad, 148 Mo. 321. There was nothing in the case calling for a reduced speed less than the train was running. Only ten families reside in this vicinity. They were some distance from the railroad track and all on the north side of it. They did not cross this crossing while journeying to or from Huntsville nor in the course of their affairs. There was no evidence of any extraordinary use of this crossing, calling for greater care than is usual. Therefore no rate of speed could be considered negligence. Cases, supra; Tobias v. Railroad, 103 Mich. 330. The evidence on the part of the defendant, with the exception of that bearing upon the rate of speed of the train and that upon the question of the crossing signals—both, in this case, immaterial matters, was simply corroborative of that of the plaintiff. Furthermore the defendant's witness Mrs. Emma Patrick, who watched the deceased all of the time until he was struck, swore that he neither stopped, looked nor listened. There being no evidence whatever to contradict this witness and all of the other evidence in the case pointing to this state of fact, there is nothing whatever in the case to take it to the jury. Stotler v. Railroad, 204 Mo. 619; Green v. Railroad, 191 Mo. 131; Schmidt v. Railroad, 191 Mo. 215; Boyd v. Railroad, 105 Mo. 371; Walker v. Railroad, 193 Mo. 453. (2) It was error to allow the witness Taggert to testify as an expert and give his opinion as to the distance in which a train running at the rate of sixty miles an hour could be stopped. The witness did not qualify as an expert and furthermore the question calling for his opinion was not a proper question. It not only did not take into consideration the weight and the equipment of the train and the condition and grade of the track, and moreover did not attempt to

specify the same conditions as were present at the time of the killing of plaintiff's husband. Gourley v. Railroad, 35 Mo. App. 92; Livery Co. v. McKelvey, 55 Mo. App. 245; Mammerberg v. Railroad, 62 Mo. App. 563; Senn v. Railroad, 108 Mo. 150; Heinzle v. Railroad, 182 Mo. 554; Ruschenberg v. Railroad, 161 Mo. 81; Culbertson v. Railroad, 140 Mo. 59.

*E. J. Howard* for respondent.

(1) The petition states a cause of action, with or without considering the statement to the jury by counsel for respondent. The statement merely outlines the facts expected to be proven in support of plaintiff's case as stated in the petition. Plaintiff may plead several distinct acts of negligence in one count of the petition, and if one negligent act be proven plaintiff is entitled to recover. Watcher v. Transit Co., 108 Mo. App. 645; Holden v. Railroad, 108 Mo. App. 665; Haley v. Railroad, 197 Mo. 15. The question of which of two or more acts of negligence was the proximate cause of the accident does not arise when the first act concurred with the other in producing the result. Newcomb v. Railroad, 182 Mo. 721. While no particular rate of speed is negligence *per se,* in absence of a statute or ordinance, yet the circumstances and surroundings may be such as to render a rate of speed negligence, even in the country and over a country crossing. The law of negligence relating to country crossings is the same as in the city; the law has no greater regard for the traveler in the city than for one in the country. Baker v. Railroad, 147 Mo. 140. While in the absence of municipal regulation no rate of speed is negligence *per se* still it does not follow, that the defendant may at all times and places run its train at any rate of speed. This was a proper element to be taken into consideration in determining whether

the defendant was guilty of negligence at the crossing. There must be a reasonable and fair regard for persons and property in running through villages and over frequently used public crossings, and the rate of speed must be made to conform reasonably with the surroundings. Stepp v. Railroad, 85 Mo. 234. While no rate of speed is *per se* negligence, in absence of statute, yet it may be considered with other circumstances on the question of negligence. Campbell v. Railroad, 59 Mo. App. 151. The jury may take into consideration on the question of negligence, evidence that the train was running at an unusual rate of speed in a thickly populated place and that no warning of its approach was given. Duffy v. Railroad, 19 Mo. App. 380; Stephens v. Railroad, 86 Mo. 226; Stepp v. Railroad, 85 Mo. 234. It cannot be held as a matter of law that a passenger train because in a country district can run at any speed. Dean v. Railroad, 199 Mo. 386; Haley v. Railroad, 197 Mo. 15; Beier v. Transit Co., 197 Mo. 215. There is no evidence in this case to show that plaintiff's husband failed to properly judge or attempted to judge the rate of speed at which the train was running at the time he met his death; and even if there was any evidence tending to show such attempt to judge the rate or failure to judge the rate properly, in this case, it would not necessarily convict deceased of contributory negligence as contended by appellant. Linden v. Transit Co., 103 Mo. App. 574; Hanheid v. Transit Co., 104 Mo. App. 323; Shafstaff v. Railroad, 175 Mo. 142; Moritz v. Transit Co., 112 Mo. App. 657; Sullivan v. Railroad, 117 Mo. 214; Hall v. Railroad, 124 Mo. App. 661. (2) The demurrer at the close of plaintiff's case was properly overruled; there was absolutely nothing in the evidence adduced by plaintiff, to show in the slightest degree, that plaintiff's husband was guilty of any contributory negligence whatever, but on the contrary the evidence and the physical facts show that he was

in the exercise of due care when he drove upon the defendant's track. The burden was on defendant to prove that he was guilty of such contributory negligence as to preclude recovery. The demurrer at the close of all the evidence, was also properly overruled. When defendant does not stand on its demurrer at close of plaintiff's case but produced its evidence, it must be held to have waived its first demurrer. Fry v. Railroad, 200 Mo. 381; Forbes v. Dunnivan, 198 Mo. 193; Jordan v. Transit Co., 202 Mo. 338. (3) The only question before this court now, is whether or not there was anything in the case to take it to the jury. This court will not sit as a jury, on this or any other case. If there is any issue in the case, for the jury, and no substantial error was committed in the trial against appellant, the court will not disturb the verdict. Under the evidence, the negligence of the defendant is thoroughly established, in not giving the statutory signals, by running at a high and dangerous speed, which under the circumstances of this case, was negligence and under the humanitarian doctrine. The only remaining question is, was there such contributory negligence on the part of plaintiff's deceased husband developed in the case as to preclude recovery. Whether or not plaintiff's deceased husband was negligent in going upon the track, of defendant, under the circumstances of this case was a question for the jury. Hall v. Railroad, 124 Mo. App. 661; Murry v. Transit Co., 108 Mo. App. 501. (4) The company is clearly liable in this case under the humanitarian doctrine. Zanders v. Transit Co., 206 Mo. 464; Powers v. Transit Co., 202 Mo. 267; Holmes v. Railroad, 207 Mo. 149; Wise v. Transit Co., 198 Mo. 546; Ross v. Railroad, 113 Mo. App. 600; Schmidt v. Railroad, 191 Mo. 235. The allegation of excessive rate of speed, and failure to check car after seeing plaintiff, is not inconsistent; both may be true. White v. Railroad, 202 Mo. 539; Moore v. Transit Co., 194 Mo. 13.

GRAVES, J.—This cause has a checkered career. Going to the Kansas City Court of Appeals from the trial court it came here upon a constitutional question. Assigned to Division One of this court and there written by one of our learned commissioners, the judges of that division failed to agree upon an opinion and thus a transfer to this court. The case made runs along these lines:

Plaintiff is the widow of T. H. B. Burge, an aged gentleman, who was struck and killed by one of defendant's passenger trains at a public crossing near Huntsville in Randolph county. The negligence charged in the petition is:

"That said agents, servants, employees and officers of defendant in charge of said locomotive and train of cars, failed to ring the bell on said locomotive at a distance of eighty rods from said crossing and to keep the same ringing until said locomotive had crossed said highway, and that said agents, servants, employees and officers also failed to sound the steam whistle of said locomotive at the distance of eighty rods from said crossing and to sound said whistle at intervals until said locomotive had crossed said highway.

"That said locomotive and train of cars at the time of the killing of her said husband as aforesaid, was being run by defendant's said agents, servants, officers and employees at a high and dangerous speed which was careless and reckless upon and across said public crossing, which said crossing is and was in a thickly populated neighborhood near the city limits of Huntsville, Missouri, and which said public crossing is and was very frequently used by the public traveling between the cities of Huntsville, Missouri, and Moberly, Missouri, all of which was well known to said officers, agents, servants and employees of defendant, then and there in charge of said locomotive and train

of cars, which killed plaintiff's said husband as aforesaid;

"That said public crossing is a dangerous one, owing to the lay of the ground and the fact that there is a sharp curve in said tracks of defendant, a short distance east of said public crossing, from which direction said train was running at the time of the killing of plaintiff's said husband as aforesaid and owing to that reason and the further fact that said locomotive and train of cars was being run at such a high and dangerous speed as aforesaid, by said agents, servants, employees and officers of defendant, upon and across said public highway, in a populous neighborhood, and the fact that said public highway was so frequently used as aforesaid, at the time of said killing of plaintiff's said husband as aforesaid, it was the duty of said agents, servants, employees and officers of defendant then and there in charge of said locomotive and train of cars, to give the statutory and other signals and to run said locomotive and train of cars at a reasonable and careful speed and to keep a sharp lookout for travelers upon or near said public crossing, all of which said agents, servants, employees and officers of defendant negligently failed to do. That said officers, agents, employees and servants of defendant in charge of said locomotive and train of cars, at the time plaintiff's said husband was killed as aforesaid, saw, or by the exercise of ordinary care could have seen him in time to avoid killing him.

"That said train was a regular passenger train running from Moberly to Kansas City, Missouri, and was about an hour behind its regular schedule time, which fact was unknown to plaintiff's said husband, and said train was being run by said agents, servants, employees and officers of defendant, at the time plaintiff's said husband was killed as aforesaid, upon and across said public crossing, at an exceedingly high and dangerous speed, which was unknown to plain-

tiff's said husband, nor could he have known of said high and dangerous speed by the use of ordinary care, and at the time when the said buggy in which plaintiff's said husband was driving, as aforesaid, and the horse hitched to same was on the tracks of defendant at the point where said highway crosses said tracks, said train was at a distance of not less than 340 feet from and east of said crossing, from which said direction said locomotive and train of cars was running at the time, and that before plaintiff's said husband could get across said tracks and into a place of safety, although he used every endeavor to do so, owing to the high and dangerous, careless and reckless speed at which said locomotive and train of cars was being run by the agents, servants and employees and officers of defendant as aforesaid, her said husband was negligently struck and killed as aforesaid, by said locomotive and train of cars.''

Answer was (1) a general denial and (2) some three separate statements of the plea of contributory negligence. Reply general denial. Verdict and judgment for plaintiff in the sum of $2000 from which defendant appealed as aforesaid. In Division we were all of opinion that there was reversible error in the case in the instructions given, but diversity of opinion arose on the question of liability or no liability. We shall discuss but two questions, i. e., the constitutional question, which gives us jurisdiction, and the question of defendant's liability under the admitted facts.

I. BOND, commissioner in the divisional opinion, has thoroughly and satisfactorily discussed the constitutional question involved, and we adopt his views. He said:

"Appellant attacks the constitutionality of the Act of April 13, 1905 (Laws 1905, p. 135), amendatory of section 2864, Revised Statutes 1899, on the ground that 'said act contains more than one subject, and the subjects of said act were not clearly expressed

in the title thereto, and for that reason said act is contrary, to section 28, article 4, of the Constitution of Missouri.'

"This point was first raised in the supplemental motion for a new trial, which also contained a second attack on the constitutionality of the act on the assumption that its effect was to leave the amount·to be recovered, in action thereunder, to the discretion of the jury within the limit of $2,000 and $10,000. This insistence was, however, abandoned in the brief later filed by appellant, in view of the adverse ruling in Young v. Railroad, 227 Mo. 307. This leaves for disposition only the constitutional question raised in the language quoted above. The act appears to the Session Laws, supra, with caption, title, section index, enacting clause, and the first few lines, to-wit:

" 'DAMAGES AND CONTRIBUTIONS IN ACTIONS OF TORT.

" 'An.Act to amend section 2864 of chapter 17 of the Revised Statutes of the State of Missouri, 1899, 'entitled "Damages and contributions in. actions of tort."

" 'Section 1. Death resulting from negligence of co-employee, officer or agent—amount of damages—who may sue for recovery.

" 'Be it enacted by the General Assembly of the State of Missouri, as follows:

" 'Section 1. That section 2864 of chapter 17 of the Revised Statutes of the State of Missouri, 1899, be and the same is hereby amended,' etc.

"The practice of amending statute· laws by reference to the sections contained in the volumes of the. authorized revisions of the laws of this State is the established law. [State v. Doerring, 194 Mo. l. c. 408; State v. Murlin, 137 Mo. 297; State v. Brodnax, 228 Mo. l. c. 54; State.ex rel. v. County Court, 128 Mo. l. c. 440-441; Ferguson v. Gentry, 206 Mo. 189.] The process by which such amendments may be made is prescribed in the Constitution, in a provision, that it

shall not be done by simply striking out or inserting designated words, but, 'the words to be stricken out, or the words to be inserted, or the words to be stricken out and those inserted in lieu thereof, together with the act or section amended, shall be set forth in full as amended.' [Constitution, art. 4, sec. 34.] The act (an excerpt from which is quoted above) was enacted, as will appear from an inspection of the Session Acts, in strict compliance with the provision of the organic law and the practice sanctioned by the decisions of this court.

"This leaves only for consideration, whether the amendatory act was rendered void under the further provision of the Constitution of this State, that 'no bill . . . shall contain more than one subject, which shall be clearly expressed in its title.' [Constitution, art. 4, sec. 28.]

"The first appearance of the act permitting a recovery of damages of a special nature and amount by special persons is in the revision of 1855, chap. 51, p. 647. It then bore the heading and title, to-wit: 'Damages. An act for the better security of life, property and character.' With some amendments it has been continued in every subsequent revision of the laws of this State. A recent amendment was enacted in 1905. At that time the Damage Act was embraced in the revision of the statutes in 1899, chap. 17, secs. 2864 and 2865 under the title, 'Damages and Contributions in Torts.' As it was amended in 1905, the act is now included in the revision of 1909, chap. 38, secs. 5425 and 5426. The title of article first of this chapter, is 'Damages in Actions for Torts.'

"The original titles of acts are often discarded when the acts are afterwards inserted in the body of the revised laws. The titles prefixed to the chapters of the various revisions is done 'by an arrangement and heading of the general statutes authorized by law.' [State v. Doerring, 194 Mo. l. c. 411; R. S.

1889, sec. 6610; R. S. 1899, sec. 4193; R. S. 1909, sec. 8090.] Such titles may be made a part of the amendatory act by suitable words of reference contained in the heading, caption or title of the amendatory act. [State v. Doerring, supra, l. c. 412.]

"In the case at bar the title of the amendatory act is identical with that of the chapter which it proposed to amend. Hence, it is clear that if the matters of amendment are germane to the provisions of the section of which they are to become a part, then the amendatory act was not an unconstitutional exercise of legislative power.

"The amendatory act, by specific reference to the section of the Damage Act proposed to be changed, called the attention of the members of the Legislature to the law as it had existed for more than fifty years, and which entitled certain persons to recover a penalty from carriers and other persons for injuries occasioned by negligence. Few provisions of the law had been more fruitful of litigation, and the provisions of no statute were more generally understood by the people, as well as the law makers, than the one providing for such recoveries. The statute had received careful and full consideration, interpretation and enforcement by the courts. It had become the warp and woof of the law governing actions for personal injuries, and the substance of its provisions was a matter of general knowledge. It is difficult to conceive that any legislator was unaware of the legislative purpose of the Act of 1905 after having read or seen the title, purposes and reference contained in the chapter and heading of that bill. In a similar case it was held, that a reference in an amendatory act to the chapter of the revision relating to 'Dower' carried to the minds of the legislators full cognizance of the nature and scope of the various provisions under that head in the chapter mentioned. [Ferguson v. Gentry, 206 Mo. l. c. 195.]

"The first thing which the amendatory act did was to abolish the defense of fellow-servants in actions based on the statute. Plainly, this was not the introduction of a matter foreign to the legislative purpose expressed in the act. The next thing done was the adding of the automobile to the other dangerous agencies for negligence in the operation of which a recovery might be had. Self-evidently, this was not an incongruous subject. The third matter of amendment was the inclusion of street and electric railways in the category of other carriers. Obviously, there was no dissimilarity in the actionable character of the injury caused by negligent operation of a street and electric railroad from that inflicted by the other carriers mentioned in the statute. Fourth, the amendment provided that the word penal should be inserted in the act. It was expressly ruled that this was the character of the act prior to the amendment. [Young v. Railroad, 227 Mo. 307.] Fifth, the amount of penalty was charged from $5000 to not less than $2000 nor more than $10,000. This was directly sanctioned in the case of Young v. Railroad, supra. Lastly, there was a provision that in the case of the failure of other representatives, the administrator of the deceased might institute the action. This was merely a provision for the survival of a cause of action, and did not render the act in anywise inharmonious with the objects and purposes of the Legislature, when the original law was passed. It was not the purpose of the Legislature, prior to this amendment, to afford the beneficiaries of this section of the Damage Act the right merely to recover for injury to their property rights, but the chief object of the original law was to secure the personal safety of persons liable to suffer from the negligent operations of dangerous agencies, by imposing a fixed penalty upon the owner or proprietor. The object of the Legislature was to redress the wrongs done to personal rights rather than to

property rights. It is upon this ground that it was ruled by this court, speaking through WOODSON, J., that *prior* to the present act, the right of action for statutory damages accruing to a minor child by the death of his parents who perished in the same railway collision would not survive on the death of the child in favor of its administrator. [Gilkeson v. Railroad, 222 Mo. 173.] The ground of this decision makes it clear that the express provision contained in the act under review, for the survival of such an action to the administrator of the party entitled to sue, is a matter naturally incident to an enlarged redress under the section of the statute comprising the Damage Act, and would not be germane or proper (as contended by appellant) as an amendment to the administration law which is normally concerned with property rights. The provision of the Constitution which the amendatory act is supposed to offend has been considered carefully on many appeals. The principle to be extracted from the rulings then made is, that it must be wisely and liberally interpreted and should not be applied so as to thwart the efficiency of intelligent and salutary legislation, and that it does not forbid the inclusion in one bill under one general title of any subject naturally connected or reasonably related to each other.

"Our conclusion is, that the amendatory Act of 1905 both as to its title and as to the matter of amendments proposed was enacted therein in strict compliance with the provisions of the Constitution under review, and that it is in all respects a valid enactment, as now found in section 5425 of the Revised Statutes of 1909. The objection to the recovery in this case on the theory that the act whereunder the statute was brought is unconstitutional, is not well taken."

II. Going now to the merits of the case a short summary of facts is required. The public crossing

at which the accident occurred is just east of Huntsville, one-fourth mile or a little more from the city limits. Going from Huntsville east toward Moberly the wagon road runs along the railroad right of way, but north of it, until it gets to this crossing. At this point the road turns on an angle and runs south until the railroad right of way is crossed, and then it runs east along the south side of the right of way. Coming from the north side of the right of way to the south side thereof at this crossing, there is an ascending incline of fifty feet, to the railroad track, as given by one of the witnesses. East of this road crossing is a considerable curve in the railroad tracks, but under the evidence a man in a buggy approaching the tracks upon this incline could be seen from 900 to 1000 feet or perhaps a fraction more. The man so situated could see the approaching train for a like distance.

The deceased came from the west along the public road on the north side of the railroad track. He was in an open buggy, and plaintiff's witnesses say it was making no noise as it passed along. He was driving at a leisurely gait with his eyes forward upon his horse. Reaching the crossing he turned south and went up this incline or embankment. One witness says that as he proceeded up the incline his eyes were fixed forward toward his horse, and he neither looked to the right nor the left. About the time he reached the tracks or was entering thereon he evidently saw the train, for several witnesses say he struck his horse as if to hurry him over the tracks. The evidence does not agree as to just when he struck the horse. One witness says the horse was four or five feet from the track when the old man raised up and struck him, and other witnesses say the horse's feet were on the track. The horse got across and was not injured. Witnesses of the plaintiff place the speed of the train as "pretty fast," "faster than usual," 60 to 70 miles per hour, and 85 to 90 miles per hour.

The train was coming from the east. Witnesses for the plaintiff, further from the track than the deceased, heard the train. In fact all heard the noise of the train, unless it was the deceased. Whether the crossing signals were given is a disputed question. All agree that danger signals were given, but differ slightly as to when. Some say just about the time of the collision, but one witness for the plaintiff, in good position to see, says they were sounded the distance of three telegraph poles or 340 feet to the east of the crossing. As to whether the train was running upon an up or down grade at that point does not appear. As to whether it was running upon a wet or dry track the evidence is silent. As to the equipment and make up of the train on that day there is no evidence. It appears to have been a regular passenger train, but running about an hour behind schedule time.

Witnesses for plaintiff all testify to the danger signals being given. Some of her witnesses who were passengers upon the train testify that they felt the application of the air to the brakes about the time of the danger whistles, and one of them says that after hearing the signals and feeling the jar from the application of the air, a forward glance out of an open window brought to view the horse as he escaped over the tracks. The train passed west of the crossing 1700 feet before coming to a stop.

For the defendant it was shown that the train was running from 45 to 50 miles per hour; that just after the crossing signal was given at the whistling post, the engineer noticed the deceased approaching the track; that the danger signals were immediately given, and air applied to the brakes. The engineer when further asked if he did all that he could to stop the train, answered: "Everything in God Almighty's power that could be done." On the application of the air and the warning signals he is corroborated by plaintiff's witnesses as above pointed out.

Plaintiff placed on the witness-stand a former railroad engineer, who testified that the train should have been stopped within about four hundred feet. This matter we will discuss in a further paragraph.

It is clear from the statement of facts that the deceased was guilty of negligence as a matter of law. A railroad crossing is within itself a signal of danger. The law imposes upon the traveler the duty of exercising caution at such places. He must make some effort to find out if there is an approaching train before he drives upon the tracks. He can close neither his eyes nor his ears. The means of self-protection given him must be used. A failure so to do constitutes negligence. In this case witnesses more unfavorably located than was deceased heard the "roar" of the approaching train. What the witnesses heard the deceased could have heard had he been in the exercise of due care. What they saw he could have seen by the exercise of due care. The fact that they heard the approaching train is conclusive that he was not exercising his sense of hearing to determine whether or not there was an approaching train. The fact that the train could have been seen 900 or more feet east of the crossing shows that he was not exercising his sense of sight. There is no room for the presumption of due care in this case. Such presumption is a presumption of fact, and upon the appearance of the facts in evidence the presumption takes flight, and no longer has a place in the case. [Higgins v. Railroad, 197 Mo. 318; Tetwiler v. Railroad, 242 Mo. 178; Morton v. Heidorn, 135 Mo. 1. c. 617, and cases therein cited.]

As said in the last named case such presumption is only applied in the absence of any evidence upon the question. In the Tetwiler case, supra, the court modified by a separate opinion the opinion of BROWN, C., upon this very question. We there said: "In this case I only concur in the result reached by our learned commissioner. I do not agree to what he says about

Burge v. Railroad.

the 'presumption of due care.' This is a presumption indulged by the law *ex necessitate*. When the man is dead and there is no evidence as to his conduct at the time of the accident, the law through the very necessity of the case indulges the presumption of due care. Presumptions of this character are presumptions of fact—and the presumption takes flight upon the appearance of the facts themselves. When the facts themselves are in evidence there is no place for a presumption as to those facts. The presumption is only indulged in the absence of evidence as to the fact of due care. In this case the partner of deceased was a witness on behalf of plaintiff and detailed the facts surrounding the accident. Such proof of the facts is the matter to be weighed by the jury, and there should not be added in the scale a presumption of fact which has been displaced by the proof of the fact. Such I think is the rule of this court.''

In the Morton case, supra, which was a will contest, and in which an instruction was condemned because it added to the scale the weight of a presumption of fact, when the facts were in evidence, this court said: "When the cause was submitted to the jury, there was no presumption of the law that the document was testator's 'free and voluntary act.' There was evidence before them which all the parties and the court alike interpreted as tending to prove undue influence. Both adversary parties asked and obtained instructions on that theory. In that state of the case it was not proper to give proponents of the will the benefit of a so-called presumption which is merely one of fact, applied in the absence of any evidence permitting a different influence. We have so often of late gone over the ground presented by the giving of such instructions, in declaring the law of negligence, that we need not repeat the argument used to indicate the vice of such declarations to a jury. We merely cite some of the decisions on that point, and add that we consider

such a mode of instruction equally as bad when applied to the subject of undue influence as to that of negligence. [Ham v. Barret (1859), 28 Mo. 388; Myers v. Kansas City (1892), 108 Mo. 480; Bluedorn v. Railroad (1894), 121 Mo. 258; Schepers v. Railroad (1895), 126 Mo. 665; Payne v. Railroad (1895), 129 Mo. 405.]''

So we say in this case, there is no presumption of due care upon the part of the deceased. The evidence shows just how and what he did. It shows that he failed to hear, when to listen was to hear, because all the witnesses heard. The evidence shows that he did not look, because it was open daylight, and to look was to see. Not only so but the evidence further shows that he looked straight ahead toward his horse, and neither turned to the right nor the left, the directions from which danger might arise. Under this state of facts, we must hold deceased guilty of negligence as a matter of law, which negligence contributed to and caused his death. There is left only the humanitarian rule and this question we take next.

III. Passing now to the humanitarian rule, how stands the plaintiff's case? To our mind there are two satisfactory reasons for holding that no case was made even under this rule of law. Even if it be granted that other matters of evidence would tend to bring the case within the rule, yet there is a failure of substantial evidence that the train could have been stopped within the space at which deceased was discovered, or could have been discovered, in a position of peril. We refer to the testimony of the so-called expert placed upon the stand by the plaintiff. This expert, James A. Taggert, said that for twenty-two years he was a locomotive engineer, but that he had not been such for the last fourteen years. His testimony then further runs thus:

''Q. Have you kept pace with the improvements

in the last few years? A. Not altogether, a good many changes have been made in the air-brake; of course I have not taken particular attention to things.

"Q. Do you know number thirteen which runs from Moberly to Kansas City? A. Yes, sir.

"Q. Did you ever run on this end of the road for the Wabash Railroad? A. Yes, sir.

"Q. How long? A. Two or three years; didn't run a regular passenger train on this end and I used to be here once in awhile.

"Q. I will ask you to state to the jury how long, in your judgment, based upon your experience as a railroad man and your knowledge of the appliances —railroad appliances—would it take a train composed of an engine and three cars—passenger coaches —to make a stop in an emergency at sixty miles an hour, in what distance?

"To which question counsel for defendant objected, for the reason that it does not embody the state of facts proven in this case; neither does the witness show that he is qualified to answer; he is not now in the employ of the company and has not been in the employ of any company for the last twelve or fourteen years and there is no evidence that this train was equipped as they were twelve or fourteen years ago, or that this man would have knowledge of the subject sufficient to give expert testimony."

"Q. Do you know how this train, number thirteen, was equipped about June, 1906? A. Of course we have air on everything, here, now, freight trains and all, engines are all equipped with air.

"By Mr. Robertson: Q. You don't know anything about this particular train this day, do you? A. No, sir.

"By the Court: Let him answer the question.

"By Mr. Howard (To the stenographer): Please read the question."

"(The stenographer then read the question as follows:)

"Q. I will ask you to state to the jury how long in your judgment, based upon your experience as a railroad man and your knowledge of the appliances—railroad appliances—would it take a train composed of an engine and three cars—passenger coaches—to make a stop in an emergency, at sixty miles an hour—in what distance?

"Counsel for defendant object to this question for the reason last above given.

"Which said objection the court overruled, and to the action of the court in overruling the said objection, the defendant, by its counsel, then and there at the time, duly excepted and saved its exceptions.

"By the witness: In an emergency—what I would call an emergency—

"By Mr. Robertson: We object.

"By the witness: In an emergency, about four hundred feet."

Neither the question nor the answer was proper in this case, and when they are stricken from the record, as they should have been upon the motion to that effect by the defendant, there is nothing left to sustain the verdict. There is no evidence of the equipment and make up of this train. There is no evidence as to the grade of the track, nor as to the condition of the track at the time. Nor is there any evidence as to how the train was loaded. In stopping a passenger train for any purpose, due regard must be had for the safety of the passengers. This element, a very material one, is left out of the question. Other material elements as to make-up and equipment of the train, and grade and condition of track, are all left out.

In Gourley v. St. Louis and S. F. Ry. Co., 35 Mo. App. l. c. 92, it is said: "Just within what distance a train might be stopped in a given case, with safety

to property, and the lives of persons thereon, would depend upon the speed of the train at the time, the grade of the track, the size of the train, whether the cars were loaded or empty, and the kind of brakes used." And on page 95 in the same case it is further said: "The attention of the witness should have been called to the particular train, the speed at which it was moving, and the condition of the grade at the place where the accident occurred."

In Mammerberg v. Street Ry. Co., 62 Mo. App. l. c. 567, SMITH, P. J., says: "The hypothetical questions, if such they may be called, were not so framed as to call the attention of the witness to a particular train, the speed it was moving and the condition of the grade at the place where the injury occurred. The hypotheses of the question were not sufficiently comprehensive. Nor did such hypothetical questions call for the opinion of the witness under circumstances and conditions similar to those disclosed by the evidence in the case. According to the rules to which reference has been made, this objectionable testimony should not have been admitted."

So, too, has said this court, in Culbertson v. Street Ry. Co., 140 Mo. l. c. 59, whereat we said: "The witness, without any qualification, was permitted to state within what distance a train could be stopped. In what distance a train under ordinary circumstances could have been stopped is one thing and a very different thing within what distance this train could have been stopped, due regard being had to the safety of the train in making the 'let-go,' and of the safety of the passengers, at this particular place and under the peculiar circumstances after the gripman discovered Culbertson was trying to pass on the east."

And in Heinzle v. Railroad, 182 Mo. l. c. 554, we further said: "It seems to us that the witness was clearly qualified from experience and personal knowledge of the situation to testify as an expert, but the

proper predicate was not laid upon which he should have been permitted to express an opinion in that it was too restrictive and did not embody important facts in the case. *It should have embraced the time and space within which a car like this one could have been stopped by a reasonably skillful motorman, after he discovered or might have by reasonable care discovered the little girl in danger, with due regard to the safety of the passengers.* [Ruschenberg v. Railroad, 161 Mo. 81; Culbertson v. Railroad, 140 Mo. 59; Mammerberg v. Railroad, 62 Mo. App. 563.]'' The italics are ours.

Again in Senn v. Railroad, 108 Mo. l. c. 151, this court through MACFARLANE, J., said: ''So the liability of defendant depends upon whether the car could have been stopped after the first appearance of danger, and it became important to know in what distance that particular car, at that place, with the condition of the track then existing, could have been stopped. We do not think this witness was sufficiently informed of the facts, as they were stated in the hypothetical question, to make his opinion admissible.''

In Ruschenberg v. Railroad, 161 Mo. l. c. 81, we said: ''Error is predicated, also, on the exclusion of an answer to the witness Meyers to the following question: 'What means would you employ as a motorman to stop a car in the shortest time and space possible?' The witness had testified that he had formerly been employed as motorman for four years on the Franklin avenue car line in St. Louis, but was at the time of the trial a member of the fire department, and that a large-sized double-truck car running down a grade with a fall of one inch and three and one-half hundredths to the one hundred feet, and running at eight miles an hour on a dry track, could be stopped in a distance from forty to forty-five feet by using a brake, and if the slack was taken up could stop it in twenty or twenty-five feet. After this, he was asked

what means he would have used to stop the train in the shortest time and space possible. The court correctly ruled that the question was improper. It should have been, within what time and space could a car like this have been stopped by a reasonably skillful motorman, after the motorman discovered, or might have by reasonable care discovered, the plaintiff's son in danger, *with due regard to the safety of the passengers on the car*?" Again the italics are ours.

Due regard for the safety of the passengers is an element that must be considered in all such cases. We emphasize this because upon the cross-examination of the witness Taggert, the means, which he says he would use in bringing such a train to a stop, leaves out of consideration this material element. It might be possible, a thing which we do not believe, that a train of three passenger coaches running at sixty miles an hour could be stopped in 400 feet, or "about four hundred feet" as the witness puts it, but we would not want to be a passenger on a train so stopped. Our doubts upon this point are fully justified by the evidence. Passengers on this particular train felt the application of the air to the brakes before the collision, and yet this train with the brakes on ran over a quarter of a mile, or 1700 feet before a stop was made.

This however is adrift. The gist of the matter is that this opinion of Taggert is worthless and of no probative force in the case, and this for the reason that he had placed before him no facts upon which he could predicate a valuable opinion. This opinion being without probative force, under the facts and the law, a fatal gap appears in plaintiff's case even under the humanitarian rule.

But we go further. If this train was running sixty miles an hour, then it made eighty-eight feet per second. Under the evidence it is clear that deceased could not have been seen, owing to the curve in the track, until the train was within 900 to 1000 feet of

him. Taking the outside limit of 1000 feet, the engineer only had 11 4-11 seconds, from the time his engine rounded the curve, to discover the peril of deceased, to sound his alarms, and to apply his brakes. Human beings can't work with the rapidity of electricity. Thoughts must be gathered and nimble fingers and hands put in motion. Seconds fleet by. They are unlike minutes. We say in this case as we did in the Degonia case, 224 Mo. 1. c. 596: ''Yet defendant is held liable for not saving life, with only ten seconds—ten ticks of the watch—in which to act.'' In the case at bar if the train was going as fast as some of plaintiff's witnesses put it there was less than ten seconds in which to act, and even if going as slow as defendant's witness put it, there was but little more. We do not believe that the facts of this case authorize its submission to the jury even upon the humanitarian rule. The engineer says that he did all he could, and in this he is corroborated by plaintiff's witnesses who felt the jar of the train when the air-brakes were applied.

IV. Whilst the evidence in this case discloses that there were a number of houses in the neighborhood of this crossing on the north side of the railroad, yet under the proof no increased use of this crossing is shown to have been occasioned thereby. The facts are that to the east of this crossing there was a coal mine, as we gather it from the evidence. This was on the north side of the track. The travel was from thence west to Huntsville, but was on the north side and not necessarily over this crossing. In fact under the evidence in this case this crossing is the ordinary and usual country crossing.

The petition lays much stress upon the rapid rate of speed. Plaintiff was impressed with that idea and some of the witnesses were evidently so impressed, when they testify to a speed of ninety miles per hour.

Under the disclosed facts the rate of speed had no special bearing upon this case, except as an element in determining within what distance the train might have been stopped. The rule is firmly fixed in this State. We had the identical question up in McGee v. Railroad, 214 Mo. l. c. 541, and there said: "It has always been held by this court that in the country, between stations, away from congested populations, it is not negligence for passenger trains to run at a rapid speed over road-crossings. If this long-established and well-known interpretation of the law was not satisfactory to. the Legislature, it must be conclusively presumed that it would have taken up the question of rapid transit under the modern demands of commerce and established a legislative rule regulating train speed at country crossings. The allegations of the petition is that regard stated no cause of action under this proof."

In the early case of Goodwin v. Railroad, 75 Mo. l. c. 76, this court held it was error upon the part of the trial court to refuse to give this instruction: "Outside of cities and towns the law does not prescribe the rate of speed of railroad trains at public crossings."

And in the earlier case of Maher v. Railroad, 64 Mo. l. c. 275, this court said: "No conceivable rate of speed is *per se* negligence, except where the law of the State, or a municipal corporation, authorized to do so, prescribes a limit." Other cases might be cited, but these suffice to amplify the rule.

Again it was the duty of deceased to look and listen before entering upon the crossing. This under the evidence he did not do. The rate of speed, although negligent, does not excuse his contributory negligence. This is true even when the train is being run in excess of ordinance speed. [Stotler v. Railroad, 204 Mo. 619.] As said in the Stotler case, had the deceased looked he could have seen the rapid rate of

speed. Our cases are so thoroughly reviewed in this Stotler case, that we content ourselves with a mere citation of it, and refer the reader to that opinion for a review of the Missouri case law. In the case at bar we conclude (1) that under the facts the humanitarian rule finds no lodgment, and (2) that the deceased came to his death by his own contributory negligence. The jury was evidently so impressed. At least such is a reasonable conclusion from a mere $2000 verdict in a death case.

The judgment in this case should be reversed outright, and it is so ordered. All concur except, *Valliant, C. J.,* absent, and *Kennish,* J., who dissents; *Lamm, J.,* concurs in result.

## DISSENTING OPINION.

KENNISH, J.—This case was transferred from Division One to the Court In Banc, upon an opinion written by BOND, C., holding that the trial court did not err in refusing defendant's demurrer to the evidence and in submitting the case to the jury, but that because of error in an instruction for the plaintiff the judgment should be reversed and the cause remanded. That opinion was concurred in in division by VALLIANT, C. J., and WOODSON, J., the latter concurring in all "except what is said about the statute being penal." LAMM, J., was *dubitante,* and GRAVES, J., dissented because in his judgment the cause should be reversed without remanding. It is the opinion of the writer that the judgment should be reversed and the cause remanded for a new trial for the reasons stated in the opinion of Judge BOND, and further that the judgment should not be reversed without remanding, for the reasons stated in the same opinion.

The opinion of the court herein reverses the judgment without remanding and from that disposition of the case I respectfully dissent. If the conclusion

reached by the court is well founded then the trial
court should have given defendant's instruction di-
recting a verdict for the defendant at the close of all
the evidence. That question is ably discussed in the
opinion written by Judge BOND and I adopt what is
there said upon that point as expressive of my views.
It is as follows:

"It is next insisted that the demurrer to the evi-
dence at the close of the trial should have been sus-
tained. In considering this assignment of error, we
must regard the entire testimony from the most fa-
vorable standpoint to plaintiff, since the defendant
waived its demurrer at the close of plaintiff's evi-
dence by thereafter putting in its own testimony.
[White v. Railroad, 202 Mo. 539.] In substance, the
petition alleged negligence arising out of conjunctive
acts. The testimony for plaintiff tended to prove
each and all of these allegations. The evidence of
both parties tended to prove that plaintiff's husband
was seen driving across the track by the fireman and
engineer when he was four or five hundred feet ahead
of the train. There was also evidence tending to
show that a similar train could have been brought to
a standstill within that distance. The evidence as to
the failure to sound the bell or blow the whistle was
positive, and that of itself was sufficient to make out
a prima facie case for plaintiff. [R. S. 1909, section
3140; McGee v. Railroad, 214 Mo. l. c. 544-545.] Hence,
unless the deceased is shown by the entire testimony
to have been guilty of negligence which directly con-
tributed to his own injury, the case was properly sent
to the jury. The only evidence, based on the actions
of the deceased, which tends to show that he had any
knowledge while driving across the track that a train
was approaching is, that he rose in his buggy, in the
act of crossing, and lashed his horse in a fruitless
endeavor to escape being struck by the train. The
train was one which ran according to a fixed schedule,

for it was made up at Moberly, Missouri, and ran from there through the town of Huntsville to Kansas City. The crossing in question was just outside of the eastern limits of Huntsville. The train was running an hour behind time. The crossing was a public one, and adjacent to it was a considerable settlement, known as West Kimberly. The inference is not inadmissible that travelers using that crossing were acquainted with the schedule time of this well-known train. This and the absence of crossing signals may account for the failure of the deceased to fully observe the duty of stopping, looking in both directions and listening for the approach of the train before entering upon a public crossing, if he failed so to do. But assuming that he was negligent in not taking these precautions and that by his negligence he was in a place of peril after driving on the track, still there is ample testimony in this record that the train approaching that crossing had just emerged from a curvature and was four or five hundred feet from him at the time, and that if it had been running at the rate of fifty or sixty miles an hour it might have been stopped in time to avoid the accident, and that he was actually seen at this distance and in this extremity by the fireman and by the engineer and by passengers on the train. This testimony combined with other testimony to the effect that it was possible within that distance to stop a train running at such a rate of speed, furnished sufficient basis for the application of the rule making it the duty of the defendant to exercise ordinary care to prevent the killing of a person who was seen to be trying to extricate himself from danger, and furnished a legal basis from which the jury were entitled to find that the proximate negligence which caused the death of plaintiff's husband, was the failure of the defendant to observe that duty. Whether the deceased was negligent or not in getting into danger, he was afterwards seen to be trying to

escape. It was then the imperative legal and moral duty of defendant's agents to seize the last clear chance to save his life by exercising ordinary care to stop the train. This is the highest teaching of Christian culture. The rule is ingrained in the web of the law of Missouri. We, therefore, rule that the trial court did not err in submitting this case to the jury."