## JOHANNA WOLF, Respondent, v. WABASH RAILWAY COMPANY, Appellant.

St. Louis Court of Appeals.   Opinion Filed April 3, 1923.

1. **DEATH BY WRONGFUL ACT: Pedestrian Killed by Train: Ordinary Care: Presumptions: Rule.** In the absence of testimony tending to show the facts in that regard, the law accords a presumption that a pedestrian who was struck and killed by a railway train while he was in the act of crossing the tract, was in the exercise of ordinary care for his own safety, but, where the facts touching the matter are disclosed by eye-witnesses, no such presumption can be reckoned with as a factor in the case.

2. **RAILROADS**: Negligence: Contributory Negligence: Pedestrian Killed at Crossing: Failure to Look and Listen: Guilty of Contributory Negligence as a Matter of Law. In an action by the widow to recover damages for the death of her deceased husband, who was struck and killed by a railway train operated by defendant, while he was in the act of crossing the track, *held*, under the evidence adduced, that deceased was guilty of negligence as a matter of law, contributing to his injury and death.

3. ———: ———: ———: Humanitarian Doctrine: Evidence: Case for the Jury. In an action by the widow to recover damages for the death of her deceased husband who was struck and killed by a railway train operated by defendant while he was in the act of crossing the track, defendant's fireman testified that as the engine was approaching the crossing, running backward, he observed the deceased approach the track from a point twenty or twenty-five feet distant therefrom, with his head down and apparently oblivious to his danger, and continued to watch him, without taking steps to cause a warning to be sounded, until the deceased was within a few feet of the track, the engine then being but twenty or thirty feet from the crossing. *Held* that a case was made for plaintiff under the humanitarian doctrine.

Appeal from the Circuit Court of the City of St. Louis. —*Hon. Charles B. Davis*, Judge.

REVERSED AND REMANDED.

*N. S. Brown* and *Homer Hall* for appellant.

(1) The court erred in overruling defendant railway company's motions to require plaintiff to elect at the beginning of the trial and after the close of all the evidence. Section 1221, Revised Statutes 1919. (2) The admission of the letter press copy book for the purpose of proving service of notice requiring the erection of crossing gates was erroneous. The laws of the State did not require or provide for the keeping of such a book, and there was no evidence that there was any ordinance of the city requiring it to be kept. Connor v. Insurance Co., 78 Mo. App. 131; State v. Tarwater, 239 S. W. 480; Galli v. Wells, 239 S. W. 894. (3) The city ordinances were improperly admitted in evidence for

the reason that control of safety protection at crossings has been taken from the city and has been vested in the Public Service Commission. Sec. 10459, Revised Statutes 1919; In re United Rys. Co., 4 P. S. C. Rep. 502; City v. Public Service Commission, 276 Mo. 509. (4)  The admission of evidence as to the minor child of deceased was reversible error. Williams v. Railway Co., 123 Mo. 573; Mahaney v. Railroad Co., 108 Mo. 191; Dayharsh v. Railroad Co., 103 Mo. 570; Stephens v. Railroad Co., 96 Mo. 207; Hecke v. Dunham, 192 S. W. 120. (5)  Instruction 1 is erroneous because it made defendant laible for failure to blow the whistle, whereas the statutes of the State provide that the defendant was not required to blow the whistle, but that it was sufficient compliance with the law if the bell was rung. Daniel v. Pryor, 227 S. W. 102, 106; Moyer v. Railroad, 198 S. W. 844; Rollison v. Railroad, 252 Mo. 525, 536; Tate v. Wabash Ry. Co., 153 Mo. App. 533; Terry v. Railway Co., 89 Mo. 586; Van Note v. Railroad Co., 70 Mo. 641. There was no substantial evidence proving that the train was moving at a high and dangerous rate of speed, and the court erred in submitting that question to the jury. The mere guess of a witness has no probative force and the submission of an issue based upon such testimony is error. McCreery v. United Rys. Co., 221 Mo. 18; Lewkowitz v. United Rys. Co., 178 Mo. App. 629; Mahaney v. K. C. Rys. Co., 286 Mo. 601, 228 S. W. 821, Underwood v. St. L. I. M. & S. Ry. Co., 182 Mo. App. 252, 168 S. W. 803; Rollinson v. Railroad, 252 Mo. 525. Instruction 1 is erroneous because there was no evidence that the death of deceased proximately resulted from the running of the engine at a high and dangerous rate of speed, as alleged in the petition and which was submitted as the second act of negligence in this instruction. Brimer v. Davis, Director General, 245 S. W. 404; Battles v. United Rys. Co., 178 Mo. App. 596; Lackey v. United Rys. Co., 231 S. W. 956. Instruction 1 is erroneous because the terms "high and dangerous rate of speed" and "timely warning" as used in it are not

defined, and it is left wholly to the conception, conjecture and caprice of the individual juror to find a meaning for those terms. Slezak v. St. Louis Transit Co., 142 Mo. App. 693; Grubb v. K. C. Rys. Co., 207 Mo. App. 16, 230 S. .W. 675. There is no evidence to show that the death of deceased directly resulted from a failure to have the gates lowered. It was error, therefore, to submit to the jury this assignment of negligence without including in it all the evidence relating to the lowering of the gates and the knowledge of deceased in respect thereto. Brimer v. Davis, Director General, 245 S. W. 404; Battles v. United Rys. Co., 178 Mo. App. 596. Instruction 1 is erroneous because it made defendant liable for failing to blow the whistle when the Revised Code of the city of St. Louis, which plaintiff identified in evidence, expressly provides that "the steam whistles of danger shall in no case be sounded except in giving usual signals for running trains," and violation of the ordinance is made a misdemeanor. Secs. 1047, 1048, Revised Code, city of St. Louis, 1914. (6) The court erred in giving instruction 3 for the following reasons: (1) There was no evidence that the engineer saw or could have seen deceased in a position of peril. (2) There was no evidence that the train could have been stopped in time to have prevented injury to deceased. Lackey v. United Rys. Co., 231 S. W. 956; Rollison v. Railroad, 252 Mo. 525. (3) There was no evidence that the fireman could have stopped the train or checked its speed, or that he could have given any signal of warning to the deceased. McGee v. Railroad, 214 Mo. 530. (4) Instruction 3 requested by plaintiff and submitting the humanitarian issue was erroneous in that it failed to require the jury to find that the train could have been stopped or its speed checked without injury to the persons on it. Dey v. United Rys. Co., 104 Mo. App. 461.; Bell v. Railroad, 72 Mo. 50; Bell v. Railroad, 86 Mo. 599. (5) The instruction is inconsistent, misleading and incapable of intelligent application for it pretends to authorize or permit the jury to find deceased was oblivious

of his peril, although he was guilty of negligence in failing to use reasonable and ordinary care to get out of the way of the train after he saw it approaching. Kinlen v. Railroad, 216 Mo. 145; Butler v. United Rys. Co., 238 S. W. 1077; State ex rel. v. Reynolds, 233 S. W. 219; Pope v. Wabash Railroad Co., 242 Mo. 232. (6) The petition does not allege that the deceased was oblivious of his peril or that the defendant's employees saw or might have seen that he was oblivious, and it was error to submit the case to the jury under the humanitarian rule. Knapp v. Dunham, 195 S. W. 1062; Rubick v. Sandler, 219 S. W. 4401. There was no substantial evidence to justify the giving of instruction 3 submitting the case to the jury on the humanitarian doctrine. Underwood v. Railway Co., 182 Mo. App. 252, 168 S. W. 803; McGee v. Railroad, 214 Mo. 530; Degonia v. Railroad, 224 Mo. 564; Burge v. Railroad, 244 Mo. 76; Rollison v. Railroad, 252 Mo. 525; Butler v. United Rys. Co., 238 S. W. 1077; Dey v. United Rys. Co., 140 Mo. App. 461. (7) The court erred in giving plaintiff's instruction 6 authorizing the jury to allow plaintiff compensation for pecuniary loss. Plaintiff, if entitled to recover at all, was only entitled to recover a penalty as a punishment and not as compensation. Section 4217, R. S. 1919; Grier v. Kansas City, C. C. & St. J. Ry. Co., 286 Mo. 523, 228 S. W. 454; Lackey v. United Rys. Co., 231 S. W. 956; Midwest Nat. Bank v. Davis, 233 S. W. 406; Bloomcamp v. Mo. Pac. Ry. Co., 236 S. W. 388; Pryor v. Payne, 244 S. W. 369. The giving of instruction 6 was erroneous for the further reason that there was no allegation in the petition of any pecuniary loss, and hence the instruction was not supported by the petition. Lackey v. United Rys. Co., 231 S. W. 956. (8) The court erred in refusing to give defendant's instruction 4 as asked. There was no evidence that engineer Bickel saw deceased, or could have seen him or known of his presence on the track or in a position of peril in time to have stopped the train or checked its speed or to have warned deceased and avoided injuring him. An

allegation of negligence not supported by the evidence should be withdrawn from consideration by the jury. Lackey v. United Rys. Co., 231 S. W. 956; McGee v. Railroad, 214 Mo. 530. (9) The court erred in refusing to give defendant's in structions 7, 8, 9 and 10, and in modifying said instructions by adding to each the words "unless you find for plaintiff under instruction numbered three," and in giving them as so modified. Daniel v. Pryor, 227 S. W. 102; Underwood v. St. L., I. M. & S. Ry. Co., 182 Mo. App. 252, 168 S. W. 803. (10) The remarks of counsel in his closing argument to the jury were improper and prejudicial. The court erred in overruling defendant's objection to such argument and in refusing to admonish counsel and discharge the jury. Kinney v. Met. St. Ry. Co., 261 Mo. 97; Crockett v. K. C. Rys. Co., 243 S. W. 902; Haynes v. Trenton, 108 Mo. 123; Evans v. Trenton, 112 Mo. 390; State v. Burns, 286 Mo. 665, 228 S. W. 766; Williams v. Railroad, 123 Mo. 573; Levels v. Railroad, 196 Mo. 606; Tuck v. Traction Co., 140 Mo. App. 335; Trent v. Printing Co., 141 Mo. App. 437. (11) The plaintiff's husband was guilty of contributory negligence in going upon the track in front of the train, which he could have seen, if he had looked, and could have heard, if he had listened, and because of his negligence the plaintiff is not entitled to recover, even though the defendant failed to observe the ordinances or was otherwise negligent. The trial court erred, therefore, in refusing to sustain defendant railway company's demurrer to the evidence, and for that reason the judgment ought to be reversed. Holtcamp v. Railroad Co., 208 Mo. App. 316, 234 S. W. 1054, and cases cited; Alexander v. St. L.-S. F. Ry. Co., 233 S. W. 44; Evans v. Ill. Cent. R. Co., 233 S. W. 397; Morrow v. Hines, 233 S. W. 493; McGee v. Wabash R. Co., 214 Mo. 530; Green v. Mo. Pac. Ry. Co., 192 Mo. 141; Stotler v. C. & A. Ry. Co., 204 Mo. 619; Schmidt v. Railroad, 191 Mo. 215. Although the defendant may have been negligent in violating an ordinance in the operation of the train, or in not having

the gates lowered at the time the train passed, yet plaintiff is not entitled to recover because her husband was guilty of contributory negligence in going upon the track without looking or listening for the approaching train. Holtcamp v. C., B. & Q. R. Co., 208 Mo. App. 316, 234 S. W. 1054, and cases cited. There is no room for resorting to presumption in respect to the exercise of ordinary care by the deceased, for the facts clearly appear. Lackey v. United Rys. Co., 231 S. W. 956; Burge v. Railroad, 244 Mo. 94; Tetwiler v. Railroad, 242 Mo. 194; Higgins v. St. L. & Sub. Ry. Co., 197 Mo. 317; Holtkamp v. C., B. & Q. R. Co., 234 S. W. 1054; Battles v. United Rys. Co., 178 Mo. App. 596; Stotler v. C. & A. Ry. Co., 204 Mo. 619; Schmidt v. Railroad, 191 Mo. 215.

*W. H. Douglass* for respondent.

(1) The court did not err in overruling defendant's demurrer, for the evidence and reasonable inferences to be drawn therefrom made a case for the jury. Maginnis v. Railroad Co., 268 Mo. 667; Maginnis v. Railroad, 182 Mo. App. 694; Strauchon v. Railroad Co., 232 Mo. 587; Lackey v. United Railways, 231 S. W. 956; Donahue v. Railroad, 81 Mo. 357; Underwood v. Railroad, 190 Mo. App. 416; Gratiot v. Railroad, 116 Mo. 450. (2) Defendant's motion to elect after the impaneling of the jury to try this case was properly overruled. Sec. 1160, R. S. 1919; State ex rel. v. Ellison, 260 Mo. 129; Fulwider v. Gas. Co., 216 Mo. 582; Lumber & Mfg. Co. v. Building & Construc. Co., 189 Mo. App. 408. (3) The record from the Street Commissioner's office of the notice served on defendant was properly admitted in evidence. Moors v. Gaus & Sons Mfg. Co., 113 Mo. 98; Priddy v. Boice, 201 Mo. 309; Galli v. Wells, 239 S. W. 894; McKelvey on Evidence (2 Ed.) sec. 206; Greenleaf on Evidence, sec. 483; Wigmore on Evidence, sec. 1634. (4) The defendant had constructed gates at the crossing in obedience to the ordinance and thereby waived notice and is estopped from denying it received notice. C. & A. Ry.

Wolf v. Wabash Railway Co.

Co. v. Averill, 224 Ill. 516; Perkins v. Wabash R. R. Co., 233 Ill. 558; 8 Thompson on Neg., sec. 1526; 7 Thompson on Neg., sec. 1534. (5) The court did not err in permitting the plaintiff to state the age of the minor child, for the record shows this evidence was admitted for the purpose of showing that the wages of the minor child belonged to plaintiff and was not a voluntary contribution. (6) Plaintiff's Instruction No. 1, submitting her right to recover on the ground that the Wabash Railroad failed to operate the gates it had constructed and maintained at the crossing, was authorized under the evidence in this case. Wach v. Railroad, 175 Mo. App. 111; Murray v. Railroad, 101 Mo. 236; Dickson v. Railroad, 104 Mo. 491; Wendler v. House Furnishing Co., 165 Mo. 527;-2 Thompson on Neg., secs. 1533 and 1534; 8 Thompson on Neg., sec. 1530. (7) The petition states a cause of action under the Humanitarian Doctrine and is not defective because it omits the word "obliviousness." Milward v. Wabash R. R., 232 S. W. 226; Heryford v. Stitcaufsky, 200 S. W. 123; Dunn v. Railways Co., 204 S. W. 592; Hill v. Railways Co., 233 S. W. 205. (8) The court did not err in giving plaintiff's instruction No. 3 on the Humanitarian Doctrine. Maginnis v. Railroad, 268 Mo. 667; Maginnis v. Railroad, 182 Mo. App. 694. But defendant is no no position to complain of this instruction submitting the Humanitarian Doctrine, for it asked the court to give an instruction which submitted the same issue to the jury. Davison v. Hines, 246 S. W. 295; Kinlen v. Railroad, 216 Mo. 166; Olferman v. Railway Co., 125 Mo. 408; Thorpe v. Railroad, 89 Mo. 650; Hill v. Railways Co., 233 S. W. 205. (9) Defendant complains that this case was tried upon the theory that the amount of recovery was damages for pecuniary loss when it should have been tried and submitted to the jury on the theory that the amount of the recovery was wholly penal, but defendant cannot complain, as it tried this case upon the same theory without objection. Simpson v. Wells, 233 S. W. 520.

ALLEN, P. J.—Plaintiff is the widow of Frank Wolf, deceased, and prosecutes this action under section 4217, Revised Statutes 1919, to recover damages for the death of her deceased husband who was struck and killed by a railway train operated by defendants, while he was in the act of crossing the track of defendant railway company at a public street crossing in the city of St. Louis. The suit was instituted against the defendant railway company and its locomotive engineer, one Bickel.

The first assignment of negligence in the petition charges that the servants of the defendant railway company saw the deceased, or by the exercise of ordinary care could have seen him or known of his presence on or near the track and in a position of peril in time, by the exercise of ordinary care, to have stopped the train or checked its speed or given him timely warning of the approach thereof by whistle, in time to have warned him of the approach of said train, and thereby avoided any injury to him, but negligently failed so to do, thereby causing his death.

The remaining five assignments of negligence are (1) the alleged negligent failure to give timely warning of the approach of said train to the crossing by blowing the whistle; (2) the alleged violation of certain city ordinances as to erecting and operating gates at the crossing, within thirty days after notice by the street commissioner of said city so to do, and limiting the speed of trains to six miles per hour if such notice be not complied with or after compliance therewith to twenty miles per hour, alleging that though the defendant railway company maintained gates at such crossing the gates were not lowered upon the occasion in question, and that said train was negligently operated at a rate of speed in excess of twenty miles per hour; (3) the alleged negligent operation of the train at a high and dangerous rate of speed across a public street in a populous city; (4) the alleged negligent failure to keep a lookout at such crossing, where defendants ought to

have anticipated the presence of persons; and (5) negligence in failing to lower said gates as a warning to the deceased.

Defendants answered separately, each answer being a general denial coupled with a plea of contributory negligence on the part of deceased.

The trial, before the court and a jury, resulted in a judgment in favor of plaintiff against the defendant Wabash Railway Company for the sum of $5000, and in favor of the defendant Bickel. From this judgment defendant railway company prosecutes this appeal. We shall refer to that company as the defendant.

Frank Wolf was killed on the morning of November 1, 1920, at the intersection of Angelica street and a railway track of defendant in the city of St. Louis. Angelica street is referred to as extending east and west and defendant's track as extending north and south, and we shall so refer to them here, though it appears that north of Angelica street defendant's track extended somewhat west of north, being nearly straight for a distance of perhaps three hundred feet and thence curving slightly toward the west. About 6:30 on the morning of the casualty Frank Wolf was walking east on the south side of Angelica street approaching defendant's track. The sidewalk on the south side of the street did not extend across the track, and at a point twenty feet or more west of the track, where a telephone pole stood near the street curbing, the deceased, it appears, left the sidewalk and walked into Angelica street, in approximately a northeasterly direction, toward defendant's track. When he had reached the track and, it is said, had stepped over the west rail thereof, he was struck by a southbound train of defendant and instantly killed. On the north line of Angelica street a shed stood about twenty-eight feet west of defendant's track, at or about the corner of which was a telephone pole. North of Angelica street, perhaps two hundred or two hundred and fifty feet, a switch track left the main track on the west side thereof, extending north; and it appears that a car was

standing on this switch track, a few feet from the main track, at a point about three hundred feet north of Angelica street. The testimony, as a whole, shows that one approaching defendant's track from the west on Angelica street had a view of the track north, after passing the shed mentioned, for a distance of at least three hundred feet; while defendant's plat in evidence and the testimony in connection therewith shows that from a point at the corner of that shed, about twenty-eight feet west of the track, there was a view north along the track, with a car on the switch in the position mentioned above, for a distance of four hundred and ninety feet, and that from a point in Angelica street four feet west of the track the view to the north was unobstructed for a distance of five hundred and sixty-two feet.

The defendant maintained gates at this crossing, but it appears that they were not operated before seven A. M., at which time the watchman in charge thereof came on duty, and they were consequently up, i. e. open, when plaintiff's husband went upon the track; though it appears that this crossing was much used prior to that hour of the morning by persons working in industrial establishments located east of the track. The train involved was a local or "accommodation" train, composed of an engine and tender and three cars. The engine was running backwards, with the tender preceding it. The evidence shows that it was a clear day, and that at the time of the casualty it was broad daylight, though there is some testimony as to smoke in the air. The deceased was fifty-four years of age, and his sight and hearing were good. For about eighteen months prior to his death it was his custom to cross the track at this crossing in going to his work east thereof, at about 6:30 A. M.

One Sneed, a witness for plaintiff, who lived in a house on the south side of Angelica street just west of the telephone pole on that side of the street, mentioned above, observed the movements of the deceased as the latter approached the track and was struck by the train. He testified that he was standing at the corner of his

house when Wolf passed and went from the sidewalk into the street. He said: "When he passed me he was on the sidewalk, going angling out of the street, because nobody goes straight over the sidewalk to the track. They always cut by the.telephone pole and step out into the middle of the street and then go across the tracks. . . . He was fixing to go up on the track, but he stopped just before he got up on the track and tightened his pipe in his mouth. . . . My attention was attracted by a bell ringing. . . . I just looked around and hollered and I saw Mr. Wolf go up in the air." He said that he had heard no bell until the ringing of the bell attracted his attention just before Wolf was struck, nor did he hear any whistle prior to that time; that in his judgment the train was running about thirty-five miles per hour, and when it stopped the rear end thereof was about a block and a half south of Angelica street; and that when Wolf stopped and "shoved his pipe in his mouth" he was about four feet from the track. When asked as to when he heard the ringing of the bell with reference to the time when Wolf was struck, he said: "All just about under one. The bell ringing and Mr. Wolf going in the air."

On cross-examination this witness said that as Wolf proceeded toward the track he was going in a northeasterly direction; that when he left the sidewalk he was about twenty feet from the track, and reached the track at about the center of Angelica street; and that he stopped at a point about four or five feet west of the west rail for a second or two only. When asked how long it was from the time when he saw Wolf standing four or five feet from the track until he observed him on the track and saw him struck, he said: "About two or three seconds as close as I could judge." And he said that there was nothing to hide Wolf's view of the track to the north; that the weather was clear and it was daylight. He said that he did not see Wolf look to the north at any time; that the engine was "backing in," pulling the train with the tender ahead, and that he observed the fireman looking out of the window on the

west side of the engine.   When asked how many feet the engine was away from Wolf when he first saw it, he said: "I couldn't say that it was any at all because it was just all together." And he said that when the train hit Wolf the latter "was near the west rail inside of the track"—that is on the track, being closer to the west rail than he was to the east rail."

One Herman, who at the time of the casualty lived in that vicinity, was on Angelica street west of defendant's track walking east.   He testified that when he was about twenty feet from the track he saw Wolf, then in the middle of the street, about six feet from the track, walking toward it and "looking a little to the south;" that he did not see Wolf stop.   The witness was on the south side of Angelica street, and he said: "I looked up north and I seen Mr. Wolf and at the same time I seen the train and I wanted to holler at Mr. Wolf but just it stuck in my throat." He further testified that when he was at Broadway, a block and a half from the track, he heard a whistle but could not tell whether it was the whistle of an engine on this track "or down in the yard." When asked if he heard any other whistle after that, he said: "No, sir; I heard not any whistle, more than just at the same time Mr. Wolf was struck when the whistle blew and the bell rang at the same moment.   .   .   .   Just at the accident Mr. Wolf stepped into the train the same moment the whistle of the train and rang the bell." When asked as to what kind of a morning it was, he said: "The morning was pretty clear down on the ground.   You can hardly see thirty or forty feet with your face up." On cross-examination he said: "I see the train coming.   I seen Mr. Wolf walking and I seen the track.   That was just a second and the whole business was done.   .   .   .   Maybe he makes a step or two in the time I look up and see the train." When asked if the train was as much as forty feet from Wolf when the latter was six feet from the track, he said: "I told you before you can hardly see forty feet before your face with the smoke laying on the ground." And

subsequently, on cross-examination, he said that he could not see more than forty feet away from him.

One Spradley, who was working for a company which used the switch north of Angelica street, mentioned above, testified that he was sixty or sixty-five feet north of Angelica street, just about north of the shed on the north side of the street and perhaps eight feet west of the track; that he was walking south with his little daughter. He said that it was a clear morning, not foggy, but a little smoky; that as the train approached him from the rear he heard no bell or whistle until after the train had passed him. He said: ''I heard the bell ring just about in the act of striking. He was pretty close. . . . After they struck him I heard the whistle; three short whistles, two or three something like that.'' His further testimony in this connection is as follows: Q. ''Did you say you saw Mr. Wolf when he was near the tracks kind of stop?'' A. ''He didn't make much of a stop, he walked on the track and looked south.'' Q. ''Do you know whether he looked north or not?'' A. I didn't see him look north.'' Q. ''Do you know whether he did or did not?'' A. ''No, sir.'' And he said that when Wolf looked south he was ''about two steps from the track.''

On cross-examination the witness testified that he knew that the train was coming because he heard the roaring of it behind him, and he took his daughter's hand and pulled her over from the track. When asked by defendant's counsel if he heard the bell ringing as the engine passed him, he answered in the affirmative, but he quickly corrected this, saying: ''No; I say I heard the bell but not as it passed me. The bell rang, as you might say, just as it hit the crossing.'' Referring to Wolf, he said: ''He walked right up to the track and looked south—just you might say he made a check and that was about all. He looked south. . . . He had his hands up, but his back was to me. He had his back to me looking south, I was north of him.'' And he re-iterated that he did not see Wolf look to the north.

Defendant's engineer testified for defendants that he was on the right hand side of his locomotive, but as the locomotive was reversed this placed him on the east side of the track, and that because of the tank in front of him he could not see on the west side of the track after he reached a point about two hundred feet north of the crossing; that the train was running about eighteen miles an hour, and the bell was ringing and had been ringing automatically for a distance of about two miles; that on approaching Angelica street he gave the usual crossing signal, four hundred or five hundred feet north thereof; that when the engine was "a few feet" north of Angelica street the fireman called to him to stop, whereupon he immediately grabbed the whistle rope, giving two whistles, and grabbed the emergency brake and stopped the train as quickly as possible. He was asked: "How soon after the warning or information from the fireman was given until the whistle sounded?" And he answered: "Just an instant, Just as quick as I could act." On cross-examination he said that the train stopped with the locomotive about three hundred feet south of Angelica street.

One Eichelberger, the fireman on defendant's engine, located on the west side thereof, stated that one could get a view of this crossing, approaching from the north, about three hundred or three hundred and fifty feet north thereof. He testified that he first saw Wolf when the latter was about fifteen or twenty feet from the track. He said: "Well he came over—he was walking in a hurry. I should judge he was about fifteen or twenty feet away from the track and had his lunch underneath his arm and his head down. And the witness said that when he first saw Wolf the train was about one hundred or one hundred and fifty feet north of the crossing, running from fifteen to eighteen miles an hour; that Wolf continued to walk east, "didn't do anything," but "just walked on," until the engine was twenty or thirty feet north of the crossing—"north of the point where he was struck," at which time Wolf was five or

ten feet from the track, when the witness called to the engineer to stop; and that the engineer therupon "blew the whistle and slapped the air on right away—the emergency brake." When asked how long it was after he called to the engineer until the whistle sounded, he said: "Almost instantly." He said that it was a clear day. He further testified that he had seen Wolf cross at this place frequently, during a period of about two months prior thereto, and that Wolf "almost always stopped and waited for the train to go by."

On cross-examination this witness said that when he first saw Wolf the latter was about twenty feet from the track, and that he watched Wolf approaching the track with his lunch under his arm and his head down until he came near the track. He said: "When I seen he was not going to stop I hollered to the engineer and turned my head away. On redirect examination, in answer to leading questions, he said that Wolf was twenty or twenty-five feet from the track when he first saw him, and that Wolf was in his view until he called to the engineer to stop, at which time Wolf was five or ten feet from the track.

The testimony of other witnesses for defendant, passengers on the train, tends to show that a whistle was blown for this crossing, and that the train was running from fifteen to eighteen miles per hour. It is unnecessary to set out the details of this testimony.

One Gray, a locomotive engineer who was a passenger on the train, testified, on cross-examination, that the train, running at thirty-five miles an hour, under the conditions existing, could not be stopped, with safety to the passengers, in less than two blocks; and that if running seventeen or eighteen miles per hour it could have been stopped in about three hundred feet.

One of the numerous assignments of error made by defendant, appellant here, is that the trial court erred in its ruling on the demurrer to the evidence, i. e., in refusing to peremptorily direct a verdict for defendant. Attending this, we shall consider first defendant's in-

sistence that plaintiff's deceased husband was guilty of contributory negligence as a conclusion of law, barring a recovery herein upon any of the assignments of primary negligence contained in the petition. A careful review of the record touching this matter has led us to the conclusion that defendant's contention in this regard must be sustained. It is true that, in the absence of testimony tending to show the facts in that regard, the law will accord to plaintiff the benefit of a presumption that her husband was in the exercise of ordinary care for his own safety when he attempted to pass over defendant's track. But where, as here, the facts touching the matter are disclosed by eye witnesses to the tragedy, no such presumption can be reckoned with as a factor in the case. [See Burge v. Railroad, 244 Mo. 76, l. c. 94, 148 S. W. 925; Guthrie v. Holmes, 272 Mo. 215, l. c. 233, et seq. 198 S. W. 854.]

The testimony for plaintiff, as well as that for defendant, leaves no room for doubt, we think, that plaintiff's husband went upon this railroad track, itself a warning of danger, without taking such precautions for his safety as the law and the dictates of ordinary prudence require. The testimony for plaintiff shows that as her husband approached the track he was proceeding in a northeasterly direction, almost facing the oncoming train, and that when he had reached the track and stepped thereupon he was almost instantly struck by the engine and killed. Upon the facts of this record we think that the conclusion is inevitable, leaving no room for the minds of reasonable men to differ with respect thereto, that had the deceased observed the care enjoined upon him by law with respect to looking and listening before committing himself to the crossing, he would have known of the approach of the train and avoided injury thereby. We cannot escape the conviction that had he looked, as was his duty, he would have seen the oncoming train in time to have avoided stepping directly in the path thereof; despite the testimony of the witness Herman that he could not see more

than forty feet—which is opposed to all the other evidence in the case. And if the conditions were such as to render looking ineffectual, it was his duty to listen for the approach of a train before stepping upon the track. Plaintiff's witness Spradley, though hearing no whistle or bell, knew of the approach of the train behind him by the "roaring" thereof. And what others, no more favorably situated, saw and heard, the deceased could have seen and heard had he been in the exercise of due care, for plaintiff testified that his hearing and eyesight were good. We must consequently hold that he was guilty of negligence as a matter of law, contributing to his injury and death. [See Burge v. Railroad, supra; Schmidt v. Railroad, 191 Mo. 215, 90 S. W. 136; Alexander v. Railway Co., 233 S. W. 48; Evans v. Illinois Central R. R. Co., 233 S. W. 397; Holtkamp v. C. B. & Q. R. Co., 208 Mo. App. 316, l. c. 327, 328, 329, and cases there collated, 234 S. W. 1054.]

In reaching the above conclusion we have not lost sight of the fact that the gates maintained by defendant at this crossing were up when the deceased went upon the track. It does not appear that this influenced the conduct of the deceased, as constituting an implied assurance of safety, since it appears from plaintiff's testimony that he was familiar with the crossing, having passed over it for eighteen months at about this same hour in the morning when the gates were not operated. Consequently defendant's remissness in this regard cannot well be seriously reckoned with in this connection—whatever effect it might have under other circumstances; though the conduct of defendant in failing to provide a watchman to operate the gates at this hour when, according to the evidence, hundreds of persons were passing over this crossing, deserves the strongest condemnation.

II. Defendant contends that the petition fails to state a case under the humanitarian doctrine for the reason that it is not alleged that plaintiff's husband

was oblivious to his peril. As to this question recent decisions of the respective divisions of our Supreme Court are in conflict. See; Karte v. Brockman Mfg. Co., 247 S. W. 417; Banks v. Morris & Co., No. 22714, not reported; the latter of which has been certified to the Court en Banc. We need not pass upon the matter, since on other grounds the judgment must be reversed and the cause remanded, and plaintiff may amend her petition if so advised.

Upon the evidence contained in this record we are entirely satisfied that a case was made for plaintiff under the humanitarian doctrine. As to this phase of the case, we may put aside nearly all of the testimony except that of defendant's fireman. That witness testified that from his position on the west side of the approaching locomotive he had a clear view of this crossing, and that when the engine was one hundred and fifty feet north thereof (in the view of his testimony most favorable to plaintiff) he observed Wolf approaching the crossing, the latter being then fifteen or twenty feet—or as the witness later said, twenty or twenty-five feet distant therefrom; that Wolf continued to approach the crossing with his head down, giving no heed to his surroundings; and that the witness continued to watch him, without taking any action to warn him of the approach of the train, until Wolf was within about five feet of the track, the engine then being but twenty or thirty feet distant from him. In other words, though the fireman saw Wolf walking into the danger zone, with his head down and oblivious to his peril, during all of the time mentioned, he did nothing to warn him until the engine was almost upon him. It will be observed that while the fireman testified that when he called to the engineer the engine was twenty or thirty feet from the crossing, the engineer says that he received the warning from the fireman when he was within a few feet of Angelica street. And from this and other testimony to which we have adverted above, it may perhaps be inferred that the train was even closer upon Wolf than would appear from the fireman's testimony before any effort was made to warn him.

It is true that it appears that in order to give warning it was necessary for the fireman to communicate with the engineer; but the testimony of both the fireman and the engineer shows that when the fireman finally acted—when it was too late—the engineer gave two short blasts upon the whistle almost instantly. And since it appears that Wolf's hearing was good, it may be readily inferred that if the fireman had acted with due diligence, when he saw Wolf approaching and entering the danger zone, utterly oblivious of his peril, and had caused the engineer to sound a timely warning, it would have sufficed to prevent the casualty. That there was evidence to take the case to the jury under the humanitarian doctrine we have no doubt.

In Hill v. Kansas City R. Co., 289 Mo. 193, 233 S. W. 205, the court, in dealing with an instruction under the humanitarian doctrine, said: "Under these pleadings (so far as the humanitarian rule is concerned) the instruction did not have to require the jury to find all three of the things specified in the portion of the petition quoted, supra. The instruction left out the matter of slackening speed. It might have included it because there was evidence tending to show no slackening of speed until the child was struck, but there was no error in leaving that matter out. The instruction might have left out both the matters of slackening speed and failure to stop, and submitted on the single matter of failure to warn. . . . Under the humanitarian rule, if the operator of a car sees one in peril, and oblivious thereof, then he is required to use any and all means at hand to avert the injury of such person. If he can stop his car, he must stop. If the slackening of speed, although unable to stop, will avert the injury, he must do that. If a warning will avert the injury, ordinary care requires that of such operator."

In Tavis v. Bush, 280 Mo. 383, 217 S. W. 274, the action was, as here, a statutory action for death, the deceased having been struck and killed by defendant's train at a crossing. Defendant's fireman when five hun-

dred feet distant from the crossing saw the deceased approaching the track in an auto truck at a speed of five or six miles an hour, knew that he was oblivious of the fact that the train was approaching, and continued to watch his approach, but failed to cause a warning to be given to him by a blast of the whistle. The court said: "If the humanitarian rule would not apply to the facts of this case then it is a rule without value and ought to be discarded."

In Murrell v. Railroad, 279 Mo. 92, (l. c. 111) 213 S. W. 964, the court said: "Even if it be conceded that deceased was guilty of negligence, as heretofore stated, yet the jury had the right to infer from the other facts in the case that the engineer saw deceased in peril when the latter was less than five hundred feet away, moving to a place of danger, oblivious of the approach of the trains. . . . Plaintiff's evidence tends to show that deceased was in peril in front of a rapidly moving train in plain view of the engineer for over five hundred feet when a few short blows of the whistle might have arrested his attention and saved him from entering upon the track."

In Maginnis v. Railroad, 268 Mo. 667, 187 S. W. 1165, the engineer watched the deceased while the latter traveled on foot a distance of seventy or eighty feet, approaching a railroad crossing, apparently oblivious to his danger. Referring to the engineer the court (l. c. 678) said: "Under such circumstances his duty was plain and began when it became apparent to a prudent operator that the deceased was intent on so acting as to place himself in a position of danger. He could not defer action until the man actually went upon the tracks, because, under the circumstances detailed, the danger zone extended beyond these limits. He should have at least given a warning when the impending danger first became apparent, thereby bringing the unwary traveler to a realization of his danger and duty to act, and this, according to some of the evidence, the engineer did not do."

In the instant case it does not appear that after the fireman saw Wolf approaching the track—or after he could have seen him by the exercise of ordinary care—the train could have been stopped before reaching the crossing, or its speed sufficiently slackened to avert the casualty. Nor do we say that when the fireman saw Wolf walking toward the track it became his immediate duty to take steps to stop the train. But the fireman's duty to cause a warning to be sounded arose when it became apparent to a prudent operator that Wolf, oblivious to his danger, was proceeding to place himself in a position of danger. When the fireman saw that the pedestrian was continuing to approach the track, with his head down and apparently oblivious to the danger, it was the duty of such operator to cause a timely warning to be sounded to bring the traveler to a realization of the impending peril. The fireman had no right to wait, as he did, until the deceased was actually entering upon the track and when it was too late for a warning to serve any purpose. And in this view we think there was no error in refusing to direct a verdict for the defendant. [See also: Eppstein v. Railroad, 197 Mo. 720, 94 S. W. 976; Hinzeman v. Railroad, 199 Mo. 56, 94 S. W. 973, 182 Mo. 611, l. c. 623, 81 S. W. 1134; Lynch v. Railroad, 208 Mo. 1, 106 S. W. 68; Dutcher v. Railroad, 241 Mo. 137, 145 S. W. 63; Milward v. Railroad, 232 S. W. 226.]

III. In view of our holding above that the deceased was guilty of contributory negligence as a matter of law, it follows that it was error to submit the case to the jury, as the trial court did, upon instructions given at plaintiff's request permitting a recovery upon assignments of primary negligence counted upon in the petition. Other assignments of error need not be reviewed. Some of the questions discussed in the briefs are disposed of by our ruling as to the contributory negligence of the deceased, and others may readily be eliminated upon another trial.

The judgment is reversed and the cause remanded. *Becker* and *Daues, JJ.,* concur.